MARTIN CHADEK v. STATE OF NEBRASKA.
294 N. W. 384

FILED OCTOBER 18, 1940.   No. 30907.

*O'Sullivan & Southard,* for plaintiff in error.

*Walter R. Johnson, Attorney General,* and *Rush C. Clarke, contra.*

Heard before SIMMONS, C. J., EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

MESSMORE, J.

In a prosecution by the state in the district court for Douglas county, Martin Chadek was convicted of murder in the second degree, and, after motion for a new trial was overruled, sentenced to serve a term of 25 years at hard labor in the state penitentiary. As plaintiff in error he brings to this court for review the record of his conviction.

Plaintiff in error (hereinafter referred to as defendant) attacks the supplemental and amended information in that it does not charge the crime of second degree murder, con-

tending that such information contains no sufficient allegation of intent to commit murder in the second degree, and fails to inform defendant of the nature and cause of the accusation, thus amounting to a deprivation of liberty without due process of law, in violation of section 3, art. I of the Constitution, and in violation of the Fourteenth Amendment to the Constitution of the United States, which provide that no person shall be deprived of liberty without due process of law.

The supplemental information in substance alleges that on June 25, 1939, the defendant unlawfully, maliciously, feloniously and purposely, but without premeditation and deliberation, shot Emma Chadek with a shotgun, and as a result thereof she died on the 25th day of June, 1939. Defendant thus committed murder in the second degree.

Section 28-402, Comp. St. 1929, provides in part: "Whoever shall purposely and maliciously, but without deliberation and premeditation, kill another, every such person shall be deemed guilty of murder in the second degree." Plaintiff in error contends that nowhere in the supplemental and amended information is it charged that the defendant shot Emma Chadek with intent to kill, or with intent to murder, citing as authority the case of *Schaffer v. State*, 22 Neb. 557, 35 N. W. 384, dealing with an indictment; that is, that the plain and obvious meaning of the statute required an intent or purpose to kill at the time of the commission of the act, and the indictment containing no allegation of intent or purpose to kill constituted error, the court holding that the intent or purpose to kill is essential to constitute the crime of murder in the second degree, and that this intent must be specifically and directly averred as part of the description of the offense in every indictment.

The information in the instant case is, in all probability, taken from the case of *Bordeau v. State*, 125 Neb. 133, 249 N. W. 291, wherein a short form of an information is set out in substantially the same language. The court concluded that the charge contained the essential elements of murder in the second degree, citing section 28-402, Comp. St. 1929,

although the question of the information was not an issue in the case. The information in the instant case, as well as that in *Bordeau v. State, supra,* is an adaptation of the form of an information for first degree murder, promulgated as a rule of practice and procedure in *Nichols v. State,* 109 Neb. 335, 191 N. W. 333. Defendant takes further exception to the information, contending that neither the form prescribed in *Nichols v. State, supra,* nor in decisions upholding informations conforming to this form, meets the requirements as set forth in the *Nichols* case, wherein the court said that the information should contain facts constituting every element in first degree murder, as defined by the statute. The court further said (p. 342) : "Tested by these standards the following brief form (of the information, which was set out) meets all requirements of the law in a prosecution like the present." Thus the court in the *Nichols* case settled the proposition, "with intent to kill," by indorsing the form of the information.

"When an information alleges all the facts or elements necessary to constitute the offense described in the statute and intended to be punished, it is sufficient." *McKenzie v. State,* 113 Neb. 576, 204 N. W. 60.

With reference to the information being in violation of the state and federal Constitutions, the consensus of authority is that the sufficiency of the indictment, or, in this case, the information, is not a federal question. See *Caldwell v. Texas,* 137 U. S. 692, 11 S. Ct. 224; *In re Robertson,* 156 U. S. 183, 15 S. Ct. 324; *Bergemann v. Backer,* 157 U. S. 655, 15 S. Ct. 727.

While the defendant makes no serious contention that the information was insufficient in that it did not specifically allege the location of the wound, "the trend of modern authority is in favor of dispensing with any allegation whatsoever respecting the location of the wound or bruise." See 13 R. C. L. 900, sec. 206, and cases cited under note 15. We deem it unnecessary to discuss the many decisions of like holding subsequent to *Nichols v. State, supra,* and conclude that any change with reference to the form of the informa-

tion, as stated in *Schaffer v. State, supra,* has been expressly overruled in the *Nichols* case and several subsequent decisions. The criticism of the information is highly technical. The defendant was not misled by it; nor did he misunderstand the charge made against him. The technical rules of the common law are relaxed in this state. *Nichols v. State, supra.* To hold this information insufficient would be to recede from our advanced position, as set forth in the *Nichols* case, and restore the old, cumbersome and involved form of information which served no useful purpose in the administration of justice. This we are not willing to do.

The foregoing analysis disposes of defendant's objections to instructions 5 and 6, given by the trial court on its own motion.

Defendant predicates error on instructions 7 and 8, given by the court on its own motion, with reference to the crime of manslaughter, in that the instructions omitted the language, "either upon a sudden quarrel," as provided in section 28-403, Comp. St. 1929, defining manslaughter. Defendant's contention is founded upon the evidence that he and his wife were engaged in a sudden quarrel at the time of the shooting and not in the commission of an unlawful act. Instruction No. 8 omitted the word "unintentional." Defendant contends that this word was of importance because he testified that he did not intend to shoot his wife. The record shows the defendant contended that he shot and killed his wife because, if he had not done so, she would have killed him or would have inflicted great bodily injury upon him; that he was in fear of his life and was defending himself. There was some evidence upon which the jury might have conceivably found that defendant committed homicide unintentionally while in the commission of an unlawful act. There is evidence that when he came home he and his wife did have some quarrelsome words, and the argument proceeded far enough that they scuffled, and in the process of scuffling she tore his shirt and he her dress, but there is nothing in the evidence which amounts to a sudden quarrel. After the argument, she went to the oppo-

site side of the basement, supposedly to secure a knife. From this time on, the case was one of self-defense. Under the circumstances and evidence in this case, the two instructions given adequately cover the offense of manslaughter. The defendant tendered no instruction on the theory that he might have killed his wife in a sudden quarrel, which would constitute manslaughter. The court is required to state in an instruction only the law under the facts proved or which the evidence tends to prove. This principle of law has been announced by this court so many times that citation of authority is unnecessary.

Defendant contends that the evidence is insufficient to sustain a conviction of murder in the second degree. We are, therefore, required to set forth the pertinent facts shown by the record.

Martin and Emma Chadek were married at Papillion, Nebraska, September 26, 1912, and lived together until the day of the tragedy, which occurred shortly after 5 o'clock p. m., Sunday, June 25, 1939. At the time, Martin was 49 years of age, five feet, seven inches tall, and weighed about 150 pounds. He was employed as a steam fitter at a packing plant. Emma Chadek, the deceased, was 50 years old, approximately five feet, one inch in height, and weighed 105 pounds. By their joint efforts they had accumulated some property during their married life. On the morning of the tragedy Martin and his brother John went to dig out an excavation at a property which Martin had purchased for rental purposes. They had remained all day at the property, and shortly before 5 o'clock left, going to a tavern where they had two pint bottles of beer, after which John went to his home, and Martin returned home.

The physical facts play an important part in this case. The tragedy occurred in the basement of the Chadek home, and the following physical facts are disclosed by the record: The stairway into the basement consists of nine steps, each two feet, eight inches wide, and seven feet in length from· the basement wall to the bottom of the steps. The basement proper is 24 feet, 8 inches from east to west, and 27 feet

from north to south. Along the south wall of the basement and to the center thereof is an old-fashioned kitchen cabinet, with drawers containing knives and other kitchen utensils. To the east of the cabinet, along the south wall, are a gas plate, chair and an inclosed toilet; to the west an electric refrigerator and a bench. Three feet from the east wall are a table and four chairs, which are approximately four feet northwest of the kitchen cabinet. This table is two feet south of a cold-air duct that extends southwest from the furnace, the furnace being located approximately in the center of the basement floor. Two feet directly south of the cold-air duct is a storage room which is along the east wall and extends approximately four feet therefrom, leaving a space of two feet between the storage room and the cold-air duct. In the northwest corner is a storage room, with a door facing south. This room extends approximately four feet from the west wall. There is a chest located against the east wall of this room; north of the chest is a Victrola; east of the Victrola is a couch. The south side of the steps is about 15 feet from the south wall of the basement; the north side of the steps nearly 10 feet from the north wall of the basement. The distance from the north lower step to the couch is approximately 12 feet, to the Victrola 14 feet, and to the storage room approximately 16 feet. The map, exhibit No. 1, is drawn to the scale of one inch to two feet. A shotgun wad was found by the east wall, north of the stairway. There is also evidence of an ironing board located in this part of the basement.

Martin Chadek testified, in substance: When he returned home, he entered the back door, which was unlatched, and, for the purpose of changing his clothes, went to the north part of the basement, about six or eight feet from the steps. His wife was in the south part of the basement, and she commenced to scold him for taking off his clothes in the basement instead of in the garage, to which he replied that it was his place and he would take off his overalls in the basement if he wanted to. She went to the kitchen cabinet, opened the drawer, obtained a butcher knife, said she was

going to kill him and proceeded toward him and threatened him, going through the two-foot space between the cold-air duct and the storage room on the west side of the basement. Martin ran around the furnace, passed the steps, but did not go up the steps. He stated that he was afraid his wife would stab him in the back and he could not get away. She continued to pursue him at a distance of three to four feet, he going to the west side of the basement and through the two-foot space between the air-duct and the storage room; thence to the storage room in the northwest corner; he reached into the storage room, picked up a 12-gauge repeating shotgun, then proceeded to the Victrola and, from the third compartment of a box standing thereon, took four shells and loaded one of the shells into the gun. They proceeded until the wife was on the north side near the bottom of the steps. Defendant claimed to be at a distance of two or three feet from her, when she lunged toward him, and he pointed the gun in her direction, shooting from the hip. She fell dead immediately. He then laid the gun beside the couch, went upstairs and called his brother John, who, with his son Leonard, came over to the house.

The coroner's physician found a gun-shot wound which made its entrance into the right upper arm. The wound entrance measured two and one-fourth inches in its longitudinal or vertical direction and an inch and a half in its transverse direction, the gun-shot going completely through the humerus, the upper arm, and then from the chest wall into the chest, and some of the shot was lodged in the heart itself. There were no powder burns. The course of the shot was from right to left. The fact that no powder burns were found on the body would at least indicate that the shot was fired from a distance of more than five feet, possibly from a distance of eight or ten feet. The marks placed on the map as to the location of the body and from where Martin said the shot was fired clearly indicate a distance of possibly eight feet or more. The story told by defendant varied in some degree as to what occurred between himself and his wife; that is, whether the argument arose over the

changing of his clothes, he having at times changed his clothes in the garage, or whether she was displeased because he had purchased other real estate. He told two different stories as to the cause of the argument and the shooting. The deceased was high-strung and evidently possessed a violent temper. She was an immaculate housekeeper, requiring those living in the house to remove their shoes and put on slippers when they arrived home from work. Blood was spattered along the floor of the basement east of the point where the deceased had been standing; that is, along the north side of the stairway, and some blood spots were found on the east wall. The record is replete with evidence of difficulties and disagreements between the defendant and his wife, even to the state of hurling missiles at each other, through the course of their married life. There is evidence of character witnesses for defendant, that he was a peaceful and law-abiding citizen.

From an analysis of the evidence, the jury found defendant guilty of murder in the second degree. It seems, from a careful reading of the record, that this analysis is correct. There is no reason why defendant could not have averted this shooting; he could have escaped by the stairway on at least one occasion and possibly two. He could have struck his wife with the gun. The obtaining by him of the gun and loading it would indicate that, under the circumstances, the wife lost some considerable time, if she had desired to assault defendant and kill him with a knife. The knife was found within a distance of five or six inches from the wife's body. An explanation of its position is difficult. There were no fingerprints on it. Obviously, she had not grasped it with a degree of firmness. The description of the wound and its progress indicate clearly that the wife was shot from the side, and also that her arm was not upraised, and that she was not facing the defendant. Evidently, therefore, she was not pursuing or attempting to assault him. The state's theory, based on the physical facts, is that the defendant did shoot his wife from a point near the couch; that his wife was not attacking him, but was attempting to

escape from the basement by the stairway, and she had in her hand, not a knife but clothing which she had ironed. This is borne out by the exhibits. The witness Benak heard a scream, which he described as "like a fire siren," immediately before the shot. There were no eyewitnesses to the uxoricide. The story told·by defendant to Captain McGuire is significant, wherein he stated he fired at a point between the storage room and the couch. At this time, he told the officer, his wife was standing at the stairway (where the body was found), a distance of eight or ten feet from where he fired the shot. This would place the wife with her right side toward the defendant. He then shot her as she reached the steps. The foregoing constitutes the evidence upon which the jury rendered their verdict. Under similar circumstances, the following rule has been adopted in this state:

In a prosecution for murder in the second degree, when the fact of unlawful killing is proved and no evidence tends to show express malice on the one hand or any justification on the other, the law presumes malice. There is an inference that the killing was intentionally done. The crime of murder in the second degree is established, and the evidence requires submission of the case to the jury. See *Preuit v. People,* 5 Neb. 377; *Davis v. State,* 51 Neb. 301, 70 N. W. 984; *Kastner v. State,* 58 Neb. 767, 79 N. W. 713; *Kennison v. State,* 80 Neb. 688, 115 N. W. 289.

For the reasons given herein, the verdict of the jury and the sentence of the court are

AFFIRMED.