HARRY MOORE, PLAINTIFF IN ERROR, v. STATE OF NEBRASKA, DEFENDANT IN ERROR.

29 N. W. 2d 366

Filed October 17, 1947.    No. 32268.

*Ross D. Druliner, Jr.,* for plaintiff in error.

*Walter R. Johnson,* Attorney General, and *Leslie Boslaugh,* for defendant in error.

Heard before SIMMONS, C. J., PAINE, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ., and THOMSEN, District Judge.

CHAPPELL, J.

Plaintiff in error, hereinafter called defendant, was

charged with murder in the first degree for the death of George Wallace by shooting. Chris Courtright and Al Mathes were jointly charged with the same offense in the same information. Defendant pleaded not guilty, and upon a separate jury trial was found guilty of murder in the second degree. His motion for new trial was overruled and he prosecuted error to this court.

Defendant's petition in error contains 34 alleged errors, and his brief formally contains 15 assignments of error. However, only two of such assignments were argued to the court or in his brief, which makes applicable the rule that errors assigned but not argued will be considered as waived. Maher v. State, 144 Neb. 463, 13 N. W. 2d 641; Mason v. State, 132 Neb. 7, 270 N. W. 661; Madsen v. State, 44 Neb. 631, 62 N. W. 1081.

In conformity therewith, we will confine our discussion to the two assignments so argued, which are substantially: (1) That the evidence adduced was insufficient to sustain the charge of murder in the first degree, therefore the submission of that issue to the jury by the trial court over defendant's timely objections was prejudicial error, and (2) that the evidence adduced was insufficient to sustain the verdict of murder in the second degree. We conclude that the assignments cannot be sustained.

Section 28-401, R. S. 1943, as applicable to this case, provides: "Whoever shall purposely and of deliberate and premeditated malice * * * kill another; * * * shall be deemed guilty of murder in the first degree, * * *."

Section 28-402, R. S. 1943, provides: "Whoever shall purposely and maliciously, but without deliberation and premeditation, kill another, every such person shall be deemed guilty of murder in the second degree; * * *."

The above-quoted sections are construed with section 29-2027, R. S. 1943, which provides that: "In all trials for murder the jury before whom such trial is had, if they find the prisoner guilty thereof, shall ascertain in

their verdict whether it be murder in the first or second degree, or manslaughter; * * *."

In State v. Hutter, 145 Neb. 798, 18 N. W. 2d 203, this court recently said that the above-quoted sections: "* * * define the degrees of the crime of criminal homicide, a single offense. The unlawful killing constitutes the principal fact and the condition of the mind or attendant circumstances determine the degree or grade of the offense, and when the greater of the degrees has been committed, the lesser degrees have also been committed, they being necessarily involved as a constituent part of the higher crime. Consequently, a conviction of murder in the second degree, or manslaughter, could legally be sustained, although the evidence made out a case of murder in the first degree."

That opinion also calls attention to the fact that the trial court was duty bound to submit to the jury such degrees of the crime charged as found sufficient support in the evidence adduced. See, also, Jackson v. Olson, 146 Neb. 885, 22 N. W. 2d 124. It follows that if, as we affirmatively conclude, the evidence adduced was sufficient to have sustained a verdict of murder in the first degree, it was of necessity sufficient to sustain a verdict of murder in the second degree, and defendant's second assignment of error falls of its own weight without further discussion of it.

We must bear in mind that no complaint is made by defendant of the form and substance of the trial court's inclusive instructions which submitted the respective degrees of the crime charged to the jury. We are, therefore, not required to elaborate upon a technical discussion of the respective necessary elements submitted, which the state was required to prove beyond a reasonable doubt, or the comprehensive definitions contained in such instructions. It is sufficient to say that we are concerned only with the sufficiency of the evidence adduced to justify submission of murder in the first degree to the jury.

As recently as Jackson v. Olson, *supra*, this court reaffirmed the rule that: "Where an information charges the crime of murder in the first degree, murder in the second degree and manslaughter are included in the charge, the degree ordinarily being for the jury; and where the evidence and circumstances of the killing are such that different inferences may properly be drawn therefrom as to the degree, the court should submit the different degrees to the jury for them to draw the inference." See, also, Denison v. State, 117 Neb. 601, 221 N. W. 683; and Jackson v. State, 133 Neb. 786, 277 N. W. 92.

Bearing the foregoing rules in mind, we have examined the record. Without dispute, the death of Wallace occurred sometime during the night of September 26, 1946, as the result of internal hemorrhages caused by a .22-caliber bullet wound through the chest. The bullet coursed from the right front, between his ribs, and through his right lung toward the rear of his body, where it lodged in approximately the ninth thoracic vertebrae of his spine. He also had a frontally affected, tearing, groove-type shotgun wound in his left leg, about six inches above the knee, which wound of itself was not sufficient to have caused his death.

On the morning of September 27, 1946, Courtright called the sheriff, telling him: "There's a dead man lying down on my doorstep." Shortly thereafter, Wallace's body was found by the sheriff and others, lying on its right side on the ground, head to the south, feet toward the door to the north, adjacent to an old door used as the step of a small two-room brick house where defendant and Courtright lived, in Benkelman, Nebraska. Blood from the leg wound had coursed down into Wallace's boot, and there were a few drops on the step.

A .410 shotgun, loaded with a shell, but closed with the hammer down, and belonging to Wallace, lay across his body. Photographs appearing in the state's evidence, taken at the time the body was found, portray the gun's

unnatural position, as if planted in afterthought, and there was competent direct evidence that after the shooting defendant himself picked up the gun and laid it up close to Wallace's shoulder or breast in the position where it was found.

A .410 shotgun and a .22 rifle, belonging to Courtright, were also found in his house. A nickel-plated .22-caliber pistol, belonging to Courtright or Mathes, was later found in the basement of the house where Mathes lived. Careful handling and professional tests revealed smudges but no distinguishable identifying fingerprints on any of the four guns. However, the .22 rifle was not in good repair, and there is competent evidence that the fatal bullet was fired from the .22 pistol.

We turn then to the evidence relating to the sequence of events at the Courtright home on the night of September 26, 1946. The afternoon and evening were spent there by defendant, Courtright, and Mathes, eating watermelon and drinking liquor. Sometime between 10 p. m. and midnight, Wallace, a stranger to defendant, but a friend of Courtright and Mathes, drove his pick-up truck to the Courtright home and parked it nearby. After he was admitted to the house, they all drank together and talked, until Wallace and defendant engaged in an argument and a scuffle ensued, wherein defendant twisted Wallace's neck with force, until Wallace, angry, said: "I've got the difference between I and you," and left the house. Whether he drove his truck away or otherwise is not clear.

Thereafter, defendant, Courtright, and Mathes talked over Wallace's probable return. In the meantime, believing that he would do so, they located Courtright's .410 shotgun and the .22-caliber pistol, provided themselves with ammunition, loaded the guns, and, thus prepared, awaited Wallace's return, which occurred within ten or fifteen minutes. The house was lighted by electricity, and as Wallace approached the open door,

defendant and Courtright, or defendant and Mathes, started shooting at him.

Courtright, a witness for the state, testified in substance that he was outside the house as Wallace approached and a shotgun blast came through the door, then as Wallace turned to the east, two pistol shots came from the east, and Wallace fell upon his right side, whereupon defendant came running from the east, hand down to his side. If that were true, then Mathes fired Courtright's .410 shotgun at Wallace from inside the house, and defendant fired the pistol at him from the outside. There are also circumstances in the evidence lending support to that theory.

Defendant testified in substance that as Wallace approached the door, with his gun, defendant went to the door and fired Courtright's .410 shotgun at him low, whereupon Courtright jumped out of the door and fired the pistol at Wallace.

The evidence demonstrates clearly that Wallace never fired his gun or attempted to do so. After he fell, mortally wounded, defendant placed Wallace's gun on his body, as heretofore recited, and defendant, Courtright, and Mathes then proceeded some distance to the Mathes home, where they went to bed, without indicating the slightest interest in the fate of Wallace or reporting the matter to proper officials.

Before sunup the next morning defendant asked a near neighbor of Mathes to go with him to Courtright's house, telling him that the night before: "* * * they had a shooting match over there. * * * 'We was shooting and shooting to kill.' * * * 'I shot one load and shot low' * * *." Defendant and the neighbor walked over to the Courtright home, saw the body, and returned. Defendant then called to Courtright: "Hey, Chris, do you know there's a dead man up in front of your door?" Thereupon Courtright got up, dressed, and notified the sheriff.

Defendant did not voluntarily surrender himself, but

about noon of September 27, 1946, the sheriff found him lying in the weeds in the vicinity of the supply tanks, near the railroad tracks. At the time of his arrest he denied any knowledge of the shooting, but the next morning he made a statement, appearing in the record, admitting his participation therein, but asserting, among other things, that Courtright fired the pistol after defendant had fired the shotgun.

We are of the opinion that there was competent evidence in the record, both direct and circumstantial, sufficient to support a finding that defendant purposely and of deliberate and premeditated malice fired the bullet from the pistol which caused Wallace's death, thereby justifying the submission of murder in the first degree to the jury.

Be that as it may, however, defendant admits that he fired the first shot, but argues that he fired the .410 shotgun at Wallace low, and only in a manner and for the purpose of stopping him, in self-defense. The answer to that proposition is that the jury, under appropriate instructions, decided the issue of self-defense against defendant.

He argues that in any event the shotgun wound did not kill Wallace, but that his death was caused by the .22-caliber bullet fired by Courtright, not by defendant, therefore he could not be found guilty of murder either in the first or second degree.

That contention is wholly without merit. The record here would be sufficient to sustain a verdict of murder in the first degree or murder in the second degree, whether or not defendant actually fired the shot which caused the death, or whether Courtright fired it. It is conclusive that defendant was present at, participated, aided, and abetted in the commission of the crime.

Under our code of criminal procedure, the law does not distinguish between principals in the first and second degree. Jahnke v. State, 68 Neb. 154, 94 N. W.

158, reported on rehearing at page 181, 104 N. W. 154, and reversed, but upon other grounds.

Section 28-201, R. S. 1943, specifically provides that: "Whoever aids, abets or procures another to commit any offense may be prosecuted and punished as if he were the principal offender."

In the light of that statute: "* * * the general rule is that one who participates or aids and abets in the commission of a homicide is himself guilty of the homicide as a principal, to be indicted, tried, and punished as such, regardless whether or not he fired the fatal shot or struck the fatal blow." 40 C. J. S., Homicide, § 9, p. 836.

In Jahnke v. State, *supra,* it was held that: "Where a person accused of the commission of a felonious homicide is present at the time aiding, abetting, and assisting or counseling and procuring its commission, and a felony is committed, then he is guilty in the same degree and to the same extent as though he had performed the act causing death."

In Puckett v. State, 144 Neb. 876, 15 N. W. 2d 63, this court said: "* * * any person who is present at the place of the crime, aiding and assisting in the commission thereof is in fact a principal and may be prosecuted as such." In that opinion it was also held that: "The same rule as to the information, conduct of the case, and punishment, applicable to a principal in fact now governs his aider, abettor or procurer, and no additional facts need to be alleged in an information against the latter than are required against his principal."

The foregoing authorities have direct application to and control decision of the case at bar.

For the reasons heretofore stated, the judgment is affirmed.

AFFIRMED.