MILO SMITH, PLAINTIFF IN ERROR, v. STATE OF NEBRASKA, DEFENDANT IN ERROR.

44 N. W. 2d 497

Filed November 3, 1950. No. 32836.

*J. E. Willits,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Robert A. Nelson,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

In a prosecution in the district court for Adams County, Milo Smith, defendant, plaintiff in error here, was convicted of grand larceny under an information that charged he unlawfully and feloniously on or about the 16th day of January 1950, stole and took away money of the value of more than $35.00 from the Home Oil Company of Hastings, Nebraska, being its property, with intent to convert it to his use, and he was sentenced to serve two years in the State Penitentiary. He presents for review the record of his conviction.

Insufficiency of the evidence to prove guilt of defendant beyond a reasonable doubt was timely and appropriately challenged during the trial, and is urged in this court as a basis for reversing the conviction.

Circumstantial evidence was relied upon by the State.

Many of the facts are admitted or are conclusively shown, but in some vital matters the evidence is in sharp conflict. Home Oil Company was, at the time important to this case, engaged in conducting a motor vehicle service station at 102 East Second Street in Hastings, Nebraska, and it was from there that the money was taken. Its location was south of the street. North of and near its building were the pumps by which gasoline was served its customers. The building had four rooms—the northwest room was identified in the evidence as No. 1; east of it was room No. 2; south of it was room No. 3; and east of rooms Nos. 2 and 3 was room No. 4, a large room with grease pit and car hoist where vehicles are serviced. There was a doorway fitted with a metal door about midway in the north wall of room No. 1 usually used by persons who visited the station. The cash register was on a stand against the south wall a short distance from the southwest corner of the room. It had one divided drawer and was equipped with a bell which sounded automatically when the drawer was opened. It could be heard by a person in room No. 3 under some circumstances. There was an opening not equipped with a door in the middle of the east wall for passage to and from room No. 2, and a similar opening about the middle of the south wall of room No. 2 for passage to and from it to room No. 3. A telephone was installed against the west side of this opening. A desk where the book and paper work of the station was done was in the southwest corner of room No. 3. Anyone at the desk could see only the southeast part of room No. 2, and no part of or anyone in room No. 1. A door in the southeast corner of room No. 3 permitted passage to and from room No. 4, and there was a large door in its north wall and a driveway from there to East Second Street.

Merritt Reichstein was in charge of the station on the 16th day of January 1950. His hours were 9 a. m. until 9 p. m. and he had sole charge of the money of

the station while on duty. It was checked each time he took over the station—in the morning, at 4 p. m., the end of the business day of the company, and when he closed the station at night. He checked the cash register at 4 p. m. on that day, but he was away from the station for 40 minutes from about five o'clock until about ten minutes of six. During that time another was in charge. Reichstein checked the contents of the register at 6:15 p. m. after he returned, and found that all items therein amounted to $872.97, including $250.00 in currency he had put in the register for change at 4 p. m. He then delivered gasoline to a customer from one of the pumps, put what he received from him in the register, and saw the currency was then in it. He went to the back office, room No. 3, to do book work and was there a few minutes when about 6:30 Milo Smith, his brother Duane Smith, and Earl May entered the station from the north into room No. 1. Reichstein heard the door open and heard them enter. They asked to use the telephone and he consented. Duane made a call to a taxi company, and then came into room No. 3 and talked to Reichstein. The defendant and Earl May were in room No. 1 all of the time they were in the station—ten minutes or more—except about a minute before they left they came to room No. 3 and were also talking to and with Reichstein. They all went to room No. 1 for a few seconds before the taxi came. When it arrived the three men left in it and went to the home of the defendant several blocks west and south of the station. When the four of them were in room No. 1 Reichstein observed the cash register and did not notice anything unusual about it, but did not examine it and it is not shown how far he was from it. He did not hear the bell on the cash register sound or ring while the defendant and his companions were there, but during much of this period Duane Smith was in room No. 3 carrying on a conversation with Reichstein while he was trying

to do book work at the desk "* * * and there was quite a bit of noise going on."

Dave Elliott, an employee of Home Oil Company who worked at its station at the intersection of Burlington Avenue and J Street, came into room No. 1 of the station on East Second Street immediately after defendant and his associates left in the taxi, and while Reichstein was still in that room. They talked briefly; a customer stopped for gasoline; Reichstein waited on him; received cash for the purchase; went to the register to put it in the drawer; and found it open and the currency gone. A check showed the register was $170.00 short. Elliott had not been to or near the register. He was in view of Reichstein all the time and stood near the opening between rooms Nos. 1 and 2. There was some evidence the register had been operated by someone not authorized because the tape showed a charge sale of $44.47 had been rung up. There was no such transaction, and any sale on credit would not have been entered on the cash register tape but would have been entered on a day sheet for the day on which the sale was made and credit extended. There was no such entry on the day sheet.

The taxi took the three men from the station to the home of the defendant. He there changed his clothes, and they then went to the cafe operated at the station of the company at Burlington Avenue and J Street. Defendant while there had "quite a few bills" folded and protruding from his vest pocket. They were there drinking intoxicating liquor until about 8 p. m. when they were arrested and taken to the police station. They were examined to ascertain what they had on them. The first search of defendant produced an empty pocketbook and "* * * two nickels and just odds and ends is all." Later when he was disrobed, fifteen $1 bills fell and were shaken from the sock he had on his left foot. Part of them were crumpled and fell out of the sock when it was removed and part of them "Looked

like they had been flattened down or stepped on" and they came out of the sock when it was shaken. Duane Smith had a billfold but no money in it except a few small coins. He had twenty-four $1 bills fastened with a paper clip and seven $5 bills with a clip on them loose in his shirt pocket. Earl May had twenty-seven $1 bills and six $5 bills in his billfold.

Defendant did not know how much money he had when he was searched, what the officers took from him, or why the money was all dollar bills. "Q. And what did they take off of you? A. * * * I don't know, but it was around $15.00. I hadn't counted it." He carried money loose in his left pants pocket until arrested and placed in a cell when he put it in a sock because "Ordinarily when they arrest you charged with drunkeness (sic) and you go in there you automatically try to keep out some money for when you post a bond. They don't make that bond more than you have in your possession, so I held it for that reason." He knew that from personal experience. He was married, and maintained and supported a home for himself and his wife. She was not employed. He had not been employed since November 17, 1949, but had casual work of not to exceed seven or eight days during the month immediately preceding his arrest, and he earned only $56.00 and received $20.00 a week unemployment compensation. He had no money on Friday before January 16, 1950, until he received his weekly check of $20.00 that day. The following day he was paid $5.00 by check for work he had performed. From the proceeds of these two checks $7.50 had been paid for rent, and he claims the $15.00 taken from his sock in the cell of the police station was what he had left of the $25.00. He cashed the checks at a grocery store, but did not claim he received only twenty-five $1 bills for them.

Duane Smith claims he had "Around about $60.00" when he went to the first service station. He was discharged from the State Penitentiary on January 15,

1950, and then received $25.00 or $30.00 and "When I came out of the penitentiary * * * she (his sister) said, 'Here is some money I owe you'" and she gave him some money.

Earl May said that when he went to the first service station he had "Approximately around $65.00"—six $5 bills and twenty-seven to twenty-nine $1 bills in a bill-fold. He had worked "off and on from" the middle of December driving cars bought by his employer to Hastings. He had made four trips and received $20.00 for each. He had spent only $15.00 in about a month.

Defendant was previously convicted of a felony. His brother, Duane Smith, 25 years of age, was an inmate of the State Industrial School at Kearney before 1944, and had served more than two years of a sentence in the State Penitentiary at Lincoln before January 15, 1950. Earl May was 24 years old, was committed to the State Industrial School at Kearney in 1936, was there four years, was in the Army from 1944 to 1946, and was then sentenced to the State Reformatory.

There was evidence on behalf of the defendant that when he and his companions came to the door of the first service station two boys came hurriedly out of room No. 1. The evidence of the State positively disputes this. The defendant and his associates vigorously and in detail deny that any of them were near, touched, came in contact with, or had anything to do with the cash register of the oil company; that they or any of them took or received any of its money; that the bell on the register sounded; or that the drawer thereof was opened or operated while they were in the station.

The determination of the trial court that the evidence required a submission of the case to the jury to decide the guilt or innocence of defendant of the charge against him was correct, and the contention of defendant that the evidence is insufficient to authorize or sustain a verdict of guilty must be denied. The credibility of the witnesses and the weight of their testimony was

for the jury to determine and the decision of the jury cannot be disturbed unless it is clearly wrong. Morrow v. State, 146 Neb. 601, 20 N. W. 2d 602. The evidence in this case prevents a conclusion that the verdict of the jury is clearly wrong and without adequate proof to justify it. The verdict is supported by consistent and related circumstances to which the jury was entitled to attach great weight.

Prejudicial error is claimed because the district court in the instructions given to the jury attempted to define what "beyond a reasonable doubt" is or is not. The instructions in these particulars are in all material respects identical with those quoted and approved in a very recent case in this court. Owens v. State, 152 Neb. 841, 43 N. W. 2d 168. Similar instructions on the subject of reasonable doubt have the sanction of many prior decisions of this court. Carr v. State, 23 Neb. 749, 37 N. W. 630; Carleton v. State, 43 Neb. 373, 61 N. W. 699; Reno v. State, 69 Neb. 391, 95 N. W. 1042; Goemann v. State, 100 Neb. 772, 161 N. W. 421.

The correctness of the instruction on the subject of circumstantial evidence is questioned. It is said that it assumes the money was taken from the oil company; that no one saw it taken; that this was not necessary; and that the State relies upon circumstantial evidence to show that the defendant took the money. To this extent the instruction is correctly understood. It was shown without any attempt at contradiction that $171.00 was wrongfully taken from the place of business of the oil company on January 16, 1950; that it was the owner of the money; and that the evidence of the State was wholly circumstantial. The jury was instructed that it could not convict the defendant unless the evidence convinced it beyond a reasonable doubt that defendant unlawfully and feloniously stole or aided or abetted others in stealing money in some amount from the company, and that the money was its property. Instructions must be considered and understood as a whole. The jury

could not have understood from anything stated in the instruction on circumstantial evidence that the court intended for it to assume that defendant took the money from the company. It is also said that the court by this instruction charged the jury that circumstantial evidence, when properly connected, is as good, convincing, and reliable as direct and positive evidence. Defendant argues that this was a prejudicial determination by the court. This is a misconception. The instruction contains this language: "It is an invariable rule of law that, to warrant a conviction upon circumstantial evidence alone, such facts and circumstances must be shown as are consistent with the guilt of the party charged, and inconsistent with his innocence; and in this case, if all the facts and circumstances relied upon by the State to secure a conviction can reasonably be accounted for upon any theory consistent with the innocence of the defendant, then the Jury should acquit him."

The State, because of a motion of defendant, elected to proceed on the count accusing defendant of the crime of grand larceny. The court instructed the jury it might find defendant guilty if it found beyond a reasonable doubt from the evidence that he stole or aided and abetted others in stealing the money. Defendant objects that the charge of larceny did not contain the crime of aiding and abetting in the commission of the larceny; that this would subject defendant to conviction for an offense not charged in the information. This argument is contrary to the well established law of the state. § 28-201, R. R. S. 1943; Scharman v. State, 115 Neb. 109, 211 N. W. 613; Puckett v. State, 144 Neb. 876, 15 N. W. 2d 63; Moore v. State, 148 Neb. 747, 29 N. W. 2d 366.

The giving to the jury of each of the instructions Nos. 4, 6, 9 and 11 is assigned as error, but any defect claimed is not specified and any of these instructions are not discussed. Errors assigned but not discussed will be considered waived and will not be examined by this court. Owens v. State, *supra;* Little v. Loup River Public

Power District, 150 Neb. 864, 36 N. W. 2d 261, 7 A. L. R. 2d 355; Maher v. State, 144 Neb. 463, 13 N. W. 2d 641.

Defendant claims prejudice because of the failure of the court to give several instructions requested by him. One of these is not mentioned in the petition in error, some obviously did not state any applicable rule of law, and the substance of the others was given by the court. Defendant has no basis of complaint in this regard. Owens v. State, *supra;* Brice v. State, 138 Neb. 853, 295 N. W. 894.

The judgment of the district court should be, and is, affirmed.

AFFIRMED.