JOHN J. VANDERHEIDEN, PLAINTIFF IN ERROR, V. STATE OF NEBRASKA, DEFENDANT IN ERROR.

57 N. W. 2d 761

Filed April 3, 1953. No. 33250.

*Mark J. Ryan* and *Clarence E. Haley,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Charles Thone,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

An information charged John J. Vanderheiden, hereinafter called defendant, with second degree murder of his wife. He pleaded not guilty, but upon trial to a jury he was found guilty. Thereafter his motion for new trial was overruled, and the trial court imposed a minimum sentence of 10 years in the State Penitentiary; whereupon defendant prosecuted error to this court.

His brief assigned numerous errors, but some of them were not discussed therein so they will be considered waived and will not be examined by this court. Smith v. State, 153 Neb. 308, 44 N. W. 2d 497. Those errors discussed were that the trial court erred: (1) In overruling defendant's motion to dismiss made at conculsion of the State's evidence and renewed at conclusion of all the evidence; (2) in submitting second degree murder to the jury; (3) in excluding, admitting, and refusing to strike certain evidence; (4) in giving instructions Nos. 12 and 17, and failing to instruct upon proximate cause and the effect of intervening cause; (5) that he was prevented from having a fair trial by misconduct of a witness; and (6) that the verdict was contrary to law and instructions of the court. We conclude that the assignments should not be sustained.

Section 28-402, R. R. S. 1943, provides: "Whoever shall purposely and maliciously, but without deliberation and premeditation, kill another, every such person shall be deemed guilty of murder in the second degree; and upon conviction thereof shall be imprisoned in the penitentiary not less than ten years, or during life."

The general rule is that: "A purpose to kill and malice are material elements of murder in the second degree and, under a charge therefor, both must be

proved beyond a reasonable doubt." Whitehead v. State, 115 Neb. 143, 212 N. W. 35. See, also, Runyan v. State, 116 Neb. 191, 216 N. W. 656; Childs v. State, 120 Neb. 310, 232 N. W. 575. The trial court so instructed the jury in the case at bar. There is a qualification of the foregoing rule, but in our view it requires no discussion here.

It is also the rule that one cannot be convicted of a felony upon his own voluntary, unsupported, extra-judicial admission or confession that a crime has been committed. On the other hand, while a voluntary admission or confession tending to prove a crime is insufficient standing alone to prove the corpus delicti, it is competent evidence and may with slight corroborating circumstances be sufficient to warrant a conviction. This court has also held that: "Circumstances capable of an innocent construction may be interpreted in the light of the defendant's admissions, and the fact under investigation be thus given a criminal aspect." Egbert v. State, 113 Neb. 790, 205 N. W. 252. See, also, Clark v. State, 151 Neb. 348, 37 N. W. 2d 601.

In Spreitzer v. State, 155 Neb. 70, 50 N. W. 2d 516, this court held that: "It is not the province of this court to resolve conflicts in the evidence in law actions, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Those matters are for the jury.

"In a criminal case, this court will not interfere with a verdict of guilty based upon the evidence, unless it is so lacking in probative force that we can say, as a matter of law, that it is insufficient to support a finding of guilt beyond a reasonable doubt." See, also, Phillips v. State, 154 Neb. 790, 49 N. W. 2d 698; Kitts v. State, 153 Neb. 784, 46 N. W. 2d 158.

Furthermore, this court has held that: "The credibility of witnesses and the weight of their testimony are for the jury to determine in a criminal case, and the conclusion of the jury cannot be disturbed unless it is

clearly wrong." Fisher v. State, 154 Neb. 166, 47 N. W. 2d 349.

In a case such as that at bar, the unlawful killing constitutes the principal fact, but the condition of the mind or attendant circumstances determine the degree or grade of the offense, that is, whether it is second degree murder or the lesser degree, manslaughter, and where the evidence and circumstances of the killing are such that different inferences may properly be drawn therefrom as to the degrees, it becomes the duty of the court to submit the different degrees to the jury for them to draw the inferences. Moore v. State, 148 Neb. 747, 29 N. W. 2d 366; § 29-2027, R. R. S. 1943. In that connection, the trial court submitted both second degree murder and manslaughter to the jury for its determination under appropriate instructions respectively relating thereto.

We turn then to the record, bearing in mind the foregoing rules and section 29-2308, R. R. S. 1943, as approved and applied in Bassinger v. State, 142 Neb. 93, 5 N. W. 2d 222. In that connection the State offered the testimony of: (1) Two physicians who saw or attended defendant's wife after she was injured but while still living, and a neighbor who called them; (2) the sheriff who saw defendant's wife after injury but while still living, took a photograph of her which appears in the evidence, and talked with defendant both before and after his wife's death; (3) city and state law enforcement officers to whom defendant made incriminating admissions or who took incriminating written statements made by defendant after his wife's death; (4) an undertaker who took defendant's wife by ambulance to a hospital in Sioux City, and cared for her body after death; (5) a photographer who took photographs of the body after death, which photographs were received in evidence; (6) an eminent pathologist who performed an autopsy upon the body, related what he found, gave his opinion of the cause of death based thereon, and

testified hypothetically as an expert; (7) the county coroner, a physician in Sioux City, who examined the body, pronounced her dead, was present at the autopsy, made out a death certificate, and corroborated the direct testimony of the pathologist in some respects with relation to what the autopsy disclosed and the cause of death; and (8) an eminent pathologist who testified hypothetically as an expert, the effect of which was to corroborate the testimony of the pathologist who performed the autopsy. Some of such witnesses related oral admissions voluntarily made by defendant both before and after his wife's death, and also laid the foundation for the admission of two voluntary written statements made and signed by defendant after his wife's death.

An examination of the record discloses that from evidence thus adduced the jury could reasonably have concluded, and it evidently did, that defendant purposely and maliciously killed his wife under the circumstances and in the manner as follows: Defendant, a farmer, had been having marital difficulties with his wife for about 2 years, and in the spring of 1951 he broke her nose in such manner as to require hospitalization. On Saturday, November 10, 1951, he cuffed, slapped, and roughed her up. The next day, Sunday, November 11, 1951, he went to town, had a few beers, and came home about 5 p. m., when they had an argument, after which he went out to do the chores, but returned in about an hour and the argument started again. Thereupon he bumped her against the kitchen cabinets, took her by the throat, and banged her head against the kitchen wall at least 3 or 4 times, maybe 9 or 10 times, struck her in the stomach with his fists, slapped her, and kicked her feet and legs as she lay on the davenport. He ordered her to bed and when she refused to go he picked her up, threw her on the bed, and slapped her a few more times. She then tried to get up, so he kicked her on the feet and legs some more and pushed her back on

the bed, where she lay still and stayed until about 6:30 a. m. Monday, when she got up around the house until about 5:30 or 6 p. m., when she fell to the kitchen floor unconscious. Such attacks by defendant left bruises over all her body, hemorrhages between the ribs on both sides, fractured the inner side of the petrous portion of her right temporal bone, produced 3 internal linear scalp tears 1½ to 2 inches in length, with large contusions on the left side of her head, including a black and swollen left eye. There were no hemorrhage, scalp, or brain injuries on the right side of her head. However, the injuries to her head heretofore set forth produced a slowly-developing hemorrhage in the left side of her brain which caused her to become unconscious about 5:30 or 6 p. m. on Monday. Although there was a functioning telephone in his house, and defendant well knew that she was then unconscious and that she thereafter continued to be so, he failed and neglected to obtain any medical care for her from that time until about 12:30 or 1 a. m., Wednesday, November 14, 1951, when two physicians were obtained by a neighbor. She was then immediately removed to a hospital where she died the next day from such slowly developing brain hemorrhage which had then become a massive blood clot ¼ to ½ inch thick over the entire left hemisphere of her brain.

Defendant testified in his own behalf, without denying a single circumstance, act, or blow, or disputing his admissions and statements which recited the same at length, except to say that he never hit his wife on the head with an instrument of any kind. His testimony and that of other defense witnesses, including his two older children, a neighboring farmer, and a surgeon who testified hypothetically by deposition, was in substance that defendant's wife seemed to walk and talk as usual on Monday, at least until after 2 p. m., but that about 5:30 or 6 p. m. on that date she appeared to be intoxicated and slipped on wet linoleum, or fell,

striking the right side of her head on a cast iron kitchen sink which stood about 28 inches above the floor, whereat she became unconscious. Their evidence was offered to establish that such fall caused the hemorrhage and death rather than the blows concededly struck by defendant.

In the light of the foregoing evidence and rules of law heretofore stated, we conclude that the State adduced ample competent evidence to support a conviction of second degree murder, therefore the trial court properly overruled defendant's motion to dismiss at conclusion of the State's evidence. We may assume also that defendant adduced some evidence which, if true, would be inconsistent with his guilt. However, as stated in Kitts v. State, *supra:* " 'But the jury had the right to reject and disregard, as it evidently did, the testimony as improbable and untrue.' " Therefore, we conclude that the trial court properly overruled defendant's motion to dismiss at conclusion of all the evidence and did not err in submitting second degree murder to the jury for its determination.

Citing but one authority, In re Estate of Olson, 176 Minn. 360, 223 N. W. 677, defendant complained that the trial court erred in refusing to admit a photostatic copy of the death certificate to show the cause of death and for purposes of impeachment. In that connection, such case is distinguishable from that at bar upon the basis of a statute which made a certified copy of a death certificate kept as required by statute " 'prima facie evidence of the fact therein stated in all courts in this state.' " We have no such statute in this state, and while there is some contrary authority, this court has in at least three civil cases concluded that a death certificate as such is not a public record and is incompetent when offered as proof of the cause of death in a controversy where the cause of death is a material issue. Sovereign Camp, W. O. W. v. Grandon, 64 Neb. 39, 89 N. W. 448; Omaha & C. B. St. Ry. Co. v. Johnson, 109 Neb.

526, 191 N. W. 691, 42 A. L. R. 1455; McNaught v. New York Life Ins. Co., 145 Neb. 694, 18 N. W. 2d 56. See, also, 16 Am. Jur., Death, § 318, p. 215; 17 C. J., Death, § 169, p. 1306; 25 C. J. S., Death, § 82, p. 1212. To apply a different rule in a criminal case could be gravely unjust to a defendant and deprive him of his constitutional right "to meet the witnesses against him face to face" (Art. I, § 11, Constitution of Nebraska), since death certificates are made ex parte without a hearing and without the right of cross-examination. Therefore, we conclude that the certificate was not admissible as such to prove the cause of death.

With regard to its admission for purpose of impeachment, we may assume that it would be admissible for such purpose under appropriate circumstances, but the record discloses that everything contained in the certificate upon which defendant relied was orally recited and testified about at length and without dispute by pathologists who testified for the State when cross-examined by defendant in an effort to impeach their testimony or change conclusions, so that its material substance was before the jury and its exclusion as such when offered for the purpose of impeachment could not have been prejudicial to defendant. In that connection also, the certificate could not have impeached the testimony of the pathologists because they did not make the certificate, and the coroner who did make it gave no testimony which could have been impeached by the certificate.

Defendant complains that the admission of certain photographs of deceased taken after death was prejudicial error. In that regard, the information charged defendant with second degree murder of his wife in that he did "assault, strike, beat and wound" her and that as a result thereof she died. The question of the number and severity of such attacks or blows was a material inquiry with relation not only to the cause of death but also to the purpose and malice of defendant. Proper

foundation was laid for introduction of the photographs. They identified deceased, graphically illustrated the condition of her body, and portrayed the location, nature, and extent of the numerous wounds and the gravity of the numerous injuries inflicted upon her by defendant. In Turpit v. State, 154 Neb. 385, 48 N. W. 2d 83, this court held: "A photograph proved to be a true representation of the person, place, or thing which it purports to represent, is competent evidence of anything of which it is competent and relevant for a witness to give a verbal description.

"Where a photograph illustrates or makes clear some controverted issue in the case, a proper foundation having otherwise been laid for its reception in evidence, it may properly be received, even though it may present a gruesome spectacle.

"Photographs of the person or body of a deceased, proper foundation having been laid, may ordinarily be received in evidence for purposes of identification, or to show the condition of the body, or to indicate the nature or extent of wounds or injuries thereon." See, also, Vaca v. State, 150 Neb. 516, 34 N. W. 2d 873; Mulder v. State, 152 Neb. 795, 42 N. W. 2d 858. Such rules are controlling here. Cases relied upon by defendant are distinguishable upon the facts, and we conclude that admission of such photographs was not prejudicially erroneous.

Defendant contended that the trial court erred in permitting the pathologist who performed the autopsy and qualified as an expert to express his opinions and conclusions with regard to the cause of various changes and conditions found by him, erred in permitting him to answer hypothetical questions which did not embrace all of the facts appearing in the evidence, and thereafter erred in refusing to strike such testimony. Defendant also contended that the trial court erred in permitting the other pathologist who qualified as an expert to answer a hypothetical question with regard to the cause

of death based upon the findings and conclusions of an autopsy performed by another, upon photographs of the body taken thereafter, and upon an assumed state of facts, some of which were contrary to the evidence, primarily because there allegedly was no evidence in the record of force in any degree having been applied to the left side of the head. Defendant also contended that the trial court erred in refusing to strike such answer. In that connection, an examination of the record discloses that there was ample evidence therein to sustain a conclusion that there was force applied by defendant to the left side of the head. We find in the question no assumption of facts contrary to the evidence.

There are well-established rules of law applicable to such situations. In Tvrz v. State, 154 Neb. 641, 48 N. W. 2d 761, this court held: "The opinion of a medical expert may rest upon any one or more of three bases, namely (1) acquaintance with the party under investigation, (2) medical examination made by the expert, or (3) a hypothetical case stated to the expert in court." As early as Curry v. State, 5 Neb. 412, this court said: "It seems well settled as a rule of law that physicians and surgeons may be allowed to say, upon a state of facts testified either by themselves or other witnesses, whether in their opinion a particular wound or blow described, would be adequate to cause death, or even whether such wound was, in their opinion, the cause of death. In a prosecution for murder, the object of such evidence relates to the inquiry of fact, whether the killing was or was not with a felonious or malicious intent. And why shall not the rule apply to prosecutions like the one under consideration? In either case the fact sought to be proved is the intent; and we find no reason why all evidence which legitimately reflects light upon the subject of inquiry, should not be admitted." See, also, 26 Am. Jur., Homicide, § 463, p. 477; 40 C. J. S., Homicide, § 257, p. 1202.

With relation to hypothetical questions, this court has

held that: "In propounding hypothetical questions to expert witnesses, it is allowable for each party to the controversy to submit such questions upon the theory of the case contended for by the side propounding them. A question is not improper simply because it includes only a part of the facts testified to. If facts are testified to which are not believed to be true, or which are believed to be immaterial to the issue, there is no rule of law requiring that they be included in the question." Hamblin v. State, 81 Neb. 148, 115 N. W. 850. Such rule was reaffirmed in Sandall v. Otto, 100 Neb. 263, 159 N. W. 406, wherein it was held: "In propounding a hypothetical question, a party may assume the existence of facts in accordance with his theory, if there is evidence in the record to sustain it, notwithstanding there may be a conflict of evidence on the point raised." In the light of such rules and the record before us, we conclude that defendant's contentions aforesaid have no merit.

Defendant testified in his own behalf, and instruction No. 12 with relation thereto, substantially instructed the jury that defendant was presumed to be innocent until proven guilty by the evidence beyond a reasonable doubt, and that in arriving at a verdict they should fully, fairly, and impartially consider his testimony together with all other evidence adduced. Defendant complains because such instruction concluded by telling the jury that it might, in connection with such instruction, consider defendant's testimony or failure thereof to controvert what had been testified to against him concerning facts which were within his own personal knowledge. In that connection defendant cites no authority to sustain his contention that such instruction was prejudicially erroneous, and we have found none. On the other hand, as early as Comstock v. State, 14 Neb. 205, 15 N. W. 355, this court held that: "The fact that a prisoner does not testify in his own behalf will not operate to his disadvantage; but if he testify, and fail

to controvert in any way what has been said by witnesses against him, concerning a fact within his own personal knowledge, it will be taken as an admission that their testimony is true." See, also, Heldt v. State, 20 Neb. 492, 30 N. W. 626, 57 Am. R. 835. Both such cases are cited with approval in Brown v. State, 111 Neb. 486, 196 N. W. 926. We have examined the instruction in the light thereof and other instructions given, and conclude that it was not prejudicially erroneous.

With regard to instruction No. 17 given by the trial court, defendant complains that the words "either upon a sudden quarrel" were omitted from the statutory definition of manslaughter set forth therein. In that connection related instruction No. 18, which set forth the material elements necessary to be established by the State beyond a reasonable doubt before defendant could be convicted of the crime of manslaughter, did contain the words aforesaid, which doubtless were inadvertently omitted from instruction No. 17. It is elementary that: "Instructions are to be considered together, to the end that they may be properly understood, and, when so construed, if as a whole they fairly state the law applicable to the evidence, error cannot be predicated on the giving of the same." Pauli v. State, 151 Neb. 385, 37 N. W. 2d 717. As held in Kirkendall v. State, 152 Neb. 691, 42 N. W. 2d 374: "Where instructions, considered as a whole, state the law fully and correctly, error will not be predicated therein merely because a separate instruction, considered by itself, might be subject to criticism.

"Where the charge to the jury, considered as a whole, correctly states the law, the verdict will not be reversed merely because a single instruction, when considered separately, is incomplete."

In Luster v. State, 148 Neb. 743, 29 N. W. 2d 364, it was held: "The court's entire charge to the jury should be considered in determining whether a slight

inaccuracy in the language of a particular instruction is prejudicial. If the instructions to the jury, taken as a whole, correctly state the law, that is sufficient." In that case, defendant complained that instruction No. 14, dealing with the elements of manslaughter, left out the words "or unintentionally." However, related instruction No. 13 contained such element. In the opinion, it was said: "In the case of Chadek v. State, 138 Neb. 626, 294 N. W. 384, instruction No. 8 also omitted the word 'unintentional,' and we said there that the defendant had tendered no instruction and that instructions Nos. 7 and 8 adequately covered the offense of manslaughter, and the same is true in the case at bar, where the jury would clearly understand that instructions Nos. 13 and 14, taken together, covered manslaughter." In the case at bar we have a comparable situation wherein related instructions Nos. 17 and 18 taken together adequately covered manslaughter without any error prejudicial to defendant.

Defendant complains of alleged misconduct of a witness. The assignment is not supported by any authority or by the testimony given by such witness. It has no merit.

Without citing any authority, defendant argued that the trial court should have instructed the jury upon proximate cause and the effect of intervening cause in conformity with his defense that his wife's death was caused by an accident. No requests for such instructions were made by defendant. An examination of the record discloses that the trial court fully, fairly, and impartially submitted the issues to the jury. In that connection, after defining "feloniously" the jury was clearly instructed that in order to find defendant guilty it was necessary to find beyond a reasonable doubt that defendant's wife "came to her death feloniously and not accidentally." The contention has no merit.

In the light of the foregoing, we have carefully examined the record and conclude that there are no er-

rors prejudicial to defendant, and that the judgment of the trial court should be and hereby is affirmed.

AFFIRMED.