CHARLES L. EGBERT V. STATE OF NEBRASKA.

FILED SEPTEMBER 29, 1925. No. 24437.

1. **Criminal Law:** PROOF: CONFESSIONS. One cannot be convicted of a felony upon his own unsupported extra-judicial confession that a crime has been committed.

2. ——: ——: ——. But, while a voluntary admission tending to prove a crime is insufficient standing alone to prove

Egbert v. State.

the *corpus delicti*, it is competent evidence, and may with slight corroborating circumstances be sufficient to warrant a conviction. *Sullivan v. State*, 58 Neb. 796.

3. ———: ———: ———. Circumstances capable of an innocent construction may be interpreted in the light of the defendant's admissions, and the fact under investigation be thus given a criminal aspect. *Sullivan v. State*, 58 Neb. 796.

4. ———: EVIDENCE: ARTICLES OF CLOTHING. In a prosecution for murder, articles of clothing worn by the victim of the homicide are, when sufficient foundation has been laid, properly received in evidence where they tend to illustrate or make clear any controverted issue in the case.

5. Assault: MANSLAUGHTER. The intentional pointing of a loaded pistol at a person is ordinarily an unlawful assault, and when under these circumstances the pistol is unintentionally discharged and a person killed, such acts constitute manslaughter.

6. Instructions given and refused examined, and *held* that the court committed no error with respect to them.

7. Evidence examined, and *held* sufficient to support the verdict and judgment.

ERROR to the district court for Adams county: LEWIS H. BLACKLEDGE, JUDGE. *Affirmed.*

*Stiner & Boslaugh, Charles E. Bruckman* and *Edmund P. Nuss,* for plaintiff in error.

*O. S. Spillman, Attorney General,* and *Lloyd Dort, contra.*

Heard before MORRISSEY, C. J., ROSE, DAY, GOOD and THOMPSON, JJ.

DAY, J.

This is the second appearance of this case in this court. Upon the first trial Charles L. Egbert, the defendant, was convicted of murder in the second degree and sentenced to serve a term of fifteen years in the penitentiary. That judgment was reversed by this court because of an erroneous instruction and the case was remanded for further proceedings. *Egbert v. State*, 112 Neb. 129. Upon the second trial the defendant was found guilty of manslaughter and sentenced to the penitentiary for a period of ten years.

He has brought the record of his conviction to this court for review.

It is first urged by defendant that the verdict and judgment are not supported by the evidence. The record shows that for some time prior to February 21, 1923, the date of the homicide, the defendant had been a practicing physician and surgeon in the city of Hastings where he resided. His family consisted of himself, his wife, his daughter, Mae Gordon, and her husband, Charles R. Gordon, the victim of the homicide, and Mary Mitchell, a sister of defendant's wife. The home of the defendant had been the home of the others. There is evidence which seems to indicate that the relationship of the parties was pleasant. On February 12, 1923, Mary Mitchell was taken to a hospital and operated upon by the defendant for appendicitis. Defendant was absent from his home on professional business during the day of February 13, 1923, and upon his return in the evening found that his daughter and her husband had left the house. Defendant testified that when he returned: "Mrs. Egbert was worrying and almost in a physical collapse, and said that the children had left." He located his daughter and her husband next day at a hotel in Hastings, and visited them almost daily. On February 17 the defendant's wife was taken to the hospital and, from that time to the date of the homicide, the defendant lived alone in the house.

It further appears that, on the evening of February 20, the defendant called upon his wife and sister-in-law at the hospital and also upon his daughter and her husband at the hotel. Later he attended a professional call and returned to his home at about midnight. In making professional calls at night it was the defendant's custom to carry a revolver. Upon his return home he laid the revolver upon a table in the dining-room and retired to a bedroom immediately adjoining. While defendant was alone in the house at about 10 o'clock in the forenoon of February 21, 1923, his daughter and her husband entered the front door by

means of a pass-key. The daughter was called as a witness for the state. She testified, in substance, that upon entering the house her husband suggested that she call "Dad;" that she thereupon called her father, at the same time removing her hat and cloak; that as she stepped into the dining-room the defendant came out of the kitchen wearing a bath-robe; that as he approached her he said, "Hello, honey, is that you?" and that she replied, "Yes;" that as he came toward her and passed the dining-room table he picked up the revolver with his left hand; that he put his right arm around her shoulder, still holding the revolver in his left hand; that at this time Roy was just inside the front door; that her father asked her, "Are you alone?" and that she replied,"No, Roy is with me;" that defendant then asked her what she wanted, and she answered that she had come for some clothes; that thereupon defendant said, " 'It's all right for you, but don't let Roy come in and get the clothes,' or something like that;" that nothing further was said; that, while they were standing in this position, her husband rushed in and grabbed hold of defendant's hands; they struggled, and "both tried to get the gun away from each other;" that Roy had hold of her father's hand which held the gun; that no words were spoken; that the gun went off twice, and Roy fell. She was asked the direct question, "Do you know who shot your husband?" and she answered, "Nobody shot him. I think it was an accident."

It further appears that after the shooting the defendant rushed out of the house onto the front porch. He was in a high state of excitement. One witness testified that he was screaming: "Mr. Yocum! Mr. Yocum! God help me, I didn't mean to do it, Mr. Yocum." Other witnesses testified that he kept repeating: "My God, I didn't mean to do it."

Dr. Beghtol, another witness for the state, testified in substance that he received a telephone call from the defendant; that the defendant said: "Doctor, come up to Dr. Egbert's residence as quick as you can. Something

terrible has happened here. Bring Stiner and the police and the sheriff;" that as he approached the house he saw the defendant on the porch; that he did not seem to have himself under control; that he was speaking in loud lamentations; that, among other things, he said, "God knows I didn't intend to do it;" that the witness took hold of the defendant and assisted him into the house; that as they were going toward the bed-room defendant sank to the floor; that the witness asked defendant, "What's happened?" and that defendant replied: " 'They came in the house and I told Mae that she could come in but he couldn't, and he came toward me and I fired,' or 'I shot,' I don't know which he said;" that defendant then asked the witness, "Is he dead?" and looked over toward the body; that the witness then examined the body and found it to be the body of Roy Gordon, the defendant's son-in-law, and that he was dead.

Another witness testified that the defendant kept repeating, "My God, I didn't mean to do it," and then, without seeming to address any one in particular, said, "He struck my wife last week, and no man can strike my wife," and that thereupon Mae Gordon said: "It's a lie. Roy never touched mother. I struck her myself." The defendant and his daughter deny that they made these statements.

Another witness testified that the evening before the tragedy he had a conversation with the defendant; that the defendant seemed to implicate Gordon with having some little trouble with Mrs. Egbert; that the defendant stated that his wife and Mary Mitchell were in the hospital, and that his only child was held a prisoner at the Clarke hotel.

The autopsy revealed that the bullet entered the body just below the left nipple, passing through the heart, and lodged a little to the right of the spine and below the point of entrance; and that the gun-shot wound was the cause of Gordon's death.

The gun in question is what is known to the trade as a 45 Colt automatic loading pistol. At the time the defendant picked the pistol up from the table it was loaded,

the trigger was cocked, and the safety catch was on. The testimony discloses that this is a proper and safe way to leave this kind of a pistol when it is loaded and not in use. In this condition the process of discharging the pistol is, first, the releasing of the safety catch, which is on the left-hand side of the barrel near the handle, and which is usually released by a slight downward pressure with the right thumb when the pistol is held in the right hand; second, a pressure with the hand against the grip safety, which is located in the back of the handle; and, third, while the grip safety is pressed in, the pulling of the trigger. When the pistol is being fired in this manner it will continue to shoot unless the pressure is released from either or both the trigger or the grip safety.

It is urged by defendant's counsel that the declarations made by the defendant were not competent evidence as tending to prove the *corpus delicti*, and that, without the declarations, evidence is wholly wanting that a crime had been committed. The rule is well established that one cannot be convicted of a felony upon his own unsupported extrajudicial confession or admission that he has committed a crime. But, while a voluntary confession is insufficient when standing alone to prove that a crime has been committed, it is competent evidence, and may with slight corroborating circumstances be sufficient to warrant a conviction. *Sullivan v. State,* 58 Neb. 796.

In the case just cited it was also held: "Circumstances capable of an innocent construction may be interpreted in the light of the defendant's confession, and the fact under investigation be thus given a criminal aspect."

The defendant denied having made some of the declarations attributed to him by the witnesses for the state. As to other statements, he testified that he had no recollection of having made them, and still others he sought to explain. Considering the entire evidence, together with the circumstances and the inferences which may be properly drawn therefrom, we think the question whether a crime had been

committed was for the jury to determine. The credibility of the witnesses, the weight to be given to their testimony, and the proper inferences to be drawn from the evidence were questions within the province of the jury. In our opinion the evidence was sufficient to justify the court in submitting the case to the jury. From this it follows that the court did not err in refusing to direct a verdict of not guilty.

It is next urged that the court erred in permitting certain clothing worn by deceased at the time of the homicide and identified as exhibits H, I, J, and K, being, respectively, a shirt, overcoat, coat, and vest, to be received in evidence and exhibited to the jury. It is contended by defendant's counsel that these exhibits did not tend to prove or disprove any controverted issue in the case, and served only to excite the minds and inflame the passions of the jury against the defendant.

There are many instances in which it is proper that articles of clothing worn by the victim of a homicide should be received in evidence when sufficiently identified. We conceive the rule to be that, when evidence of this character tends to throw light upon or illustrate any controverted issue, then it is admissible. When, however, such evidence has no tendency to establish the guilt or innocence of the accused, and is effective only to inflame the passions of the jury, it should not be received. This we understand to be the rule announced in *McKay v. State,* 90 Neb. 63; *Flege v. State,* 93 Neb. 610; *Blazka v. State,* 105 Neb. 13.

In the case before us it was the theory of the defense that the deceased came to his death by the accidental discharge of a pistol held in the left hand of the defendant while defendant and deceased were engaged in a struggle for the possession of the pistol, and that the struggle was precipitated by the action of the deceased in attempting to wrest the pistol from the defendant. The testimony indicated that there were no powder marks or burns visible upon the clothing worn by the deceased at the time it was

removed from the body of the deceased a few hours after the homicide. Testimony was introduced on behalf of the state showing the result of experiments in firing the pistol loaded with the same class of ammunition as that with which it was loaded at the time of the homicide. When the pistol was fired with the muzzle against a vest which was used, a hole was torn in the cloth about four inches in diameter, and where the bullet entered was a ring of scorched cloth. At a distance of three inches there was a ring of scorched cloth about the size of a five cent piece, and also showed a ring of unexploded powder around the scorched part. At six inches the scorch was not so perceptible, but the powder marks were very distinct. At a foot powder marks were very much in evidence. At three feet there were still grains of powder on the cloth and imbedded somewhat in the cloth. The evidence on behalf of the defendant upon this question tended to somewhat contradict the state's evidence on this subject.

In view of the entire record, we think the exhibits tended to throw some light upon the controverted questions presented to the jury, and that they were properly received in evidence. In this connection it is urged by defendant that no proper foundation was laid for the introduction of exhibits H, I, J, and K, because it was not shown that the exhibits were in the same condition that they were in immediately after the homicide. It was shown that the exhibits were clothing worn by the deceased at the time. An inspection shows a clean cut round hole through 'the clothing the size of the bullet. A strict compliance with the rule would have required a showing that the clothing when offered in evidence was in the same condition as at the time of the homicide. That there was no proper foundation laid was hardly sufficient to challenge the attention of the court to the point now urged. In any event, the admission of the exhibits in evidence, if error, was without prejudice to the defendant.

The correctness of instruction No. 5 is assailed by the defendant. This instruction reads as follows:

"In reference to the offense of manslaughter, to support which the killing must have been done either upon a sudden quarrel or unintentionally while the slayer was in the commission of some unlawful act, you will determine from the evidence whether these things or either of them existed and have been established by the evidence; and you are further instructed that under the laws of this state one who threatens another in a menacing manner commits an unlawful act, and if you are convinced by the evidence beyond a reasonable doubt that the defendant at the time and place stated in the information was threatening the deceased, Charles R. Gordon, or the wife of said Gordon, in a menacing manner, and while in the commission of some unlawful act and by reason thereof the revolver was discharged, accidentally or otherwise, whereby said Gordon was shot and killed, then the defendant would be guilty of manslaughter.

"It is not unlawful for one to own and have in his possession in his home firearms and ammunition for use in a lawful way."

In defining the offense of manslaughter the instruction is in the language of the statute. The criticism is made that there is no evidence of threats or of any unlawful act on the part of the defendant, and that therefore the instruction complained of is not responsive to the evidence. We are unable to agree with this contention. We think the evidence was such that the jury might well infer that the defendant intentionally pointed a loaded pistol at the deceased. If this were done it would be an unlawful assault, and if under these circumstances the pistol was unintentionally discharged and a person killed, it would constitute manslaughter. *Ford v. State,* 71 Neb. 246; *Schultz v. State,* 89 Neb. 34; *Thiede v. State,* 106 Neb. 48. From the testimony of Dr. Beghtol and other witnesses, the position of the wound, and the circumstances in evidence, we think the jury might well find that the defendant was guilty of manslaughter. In our opinion the instruction is responsive to that issue.

It is also urged that the court erred in giving instruction No. 6. By this instruction the court defined the word "accident," and in the course of the instruction this language was used:

"As before stated to you, the burden is not upon the defendant to prove by the greater weight of the evidence that the shooting was an accident, but to warrant a verdict of guilty the state must satisfy you beyond a reasonable doubt that the revolver at the time and place in question was not accidentally discharged, or, if accidentally discharged, that the defendant was then in the commission of an unlawful act directly connected therewith, as explained in these instructions.

"If the shot which caused the death of Charles R. Gordon was wholly accidental so far as the defendant was concerned, and without intention on his part to kill or injure or menace any person, and not while the defendant was in the commission of an unlawful act, then your verdict should be not guilty."

The criticism is made that by the use of the term "wholly accidental" a burden was placed upon the defendant which is not recognized in criminal practice. Taking the charge as a whole, we do not think that the instruction is vulnerable to the attack made upon it. Throughout the instructions it is made clear that the burden was upon the state to prove the guilt of the defendant beyond a reasonable doubt, and that the burden never shifted, but was at all times on the state. There was no error in the giving of this instruction.

It is urged that the court erred in failing to give instruction No. 3 requested by the defendant. This instruction in effect told the jury that, if the evidence failed to disclose a motive on the part of the defendant to commit the offense charged, "this is a circumstance in favor of his innocence." Defendant relies upon *Clough v. State,* 7 Neb. 322, and *Smith v. State,* 61 Neb. 296, to support his contention that the proffered instruction was erroneously refused.

In the *Clough* case an instruction somewhat more favorable to the accused was held properly refused, and in the discussion which followed there is a dictum to the effect that an instruction substantially in the language of the one proffered would have been proper. We are of the view, however, that the instruction tendered is not a correct statement of the law. It is not the province of the court to instruct the jury what weight or bearing should be given to a particular circumstance. As applied to the present situation, the instruction should go no further than to inform the jury that such a circumstance should be considered by them in connection with all the other facts and circumstances in determining the guilt or innocence of the defendant.

In the *Smith* case, *supra,* an instruction very similar to the one requested was given. In that case the defendant contended that the instruction was erroneous. It was held that, the instruction being favorable to the accused, he could not predicate error thereon.

Criticism is made in the brief to other alleged errors; among them, the failure of the court to give an instruction to the effect that no consideration should be given to questions which were not answered and to answers which were subsequently stricken from the record; also, to misconduct on the part of the county attorney in persisting in asking questions along a certain line after the court had clearly ruled that such testimony was inadmissible. We deem it unnecessary to go into a detailed discussion of these criticisms. In a long trial it is almost inevitable that things occur which a reviewing court might desire had not happened. This is true in this case, but on the whole we regard them as not of sufficient importance to amount to prejudicial error. We have considered all the assignments of error and in our opinion they are not sufficient to show prejudicial error. In the instructions given the court clearly and carefully guarded the rights of the defendant. His theory of the case was submitted to the jury.

Upon an examination of the entire record and the fair inferences based thereon, we are clearly of the opinion that the evidence is sufficient to support the verdict and judgment. No prejudicial error appearing in the record, the judgment of the district court is

AFFIRMED.

Note—See Criminal Law, 16 C. J., secs. 1226, 1514.