DANNY TURPIT, PLAINTIFF IN ERROR, V. STATE OF NEBRASKA, DEFENDANT IN ERROR.

48 N. W. 2d 83

Filed June 1, 1951. No. 32975.

*Max G. Towle, James D. Conway,* and *D. B. Massie,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Bert L. Over-cash,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

CHAPPELL, J.

An information charged defendant with manslaughter. A jury found him guilty. His motion for new trial was overruled, and, after refusing the application of his counsel to place him on probation, defendant was sentenced to one year and three months in the State Penitentiary. Thereupon defendant prosecuted error to this court, assigning substantially that: (1) The trial court erred in admitting certain evidence; and (2) erred in giving instruction No. 7. We conclude that the assignments should not be sustained. Other alleged errors assigned but not argued will, under the rules of this court, be considered as waived. Revised rules of the Supreme Court, 8 a 2 (4), (5). Mason v. State, 132 Neb. 7, 270 N. W. 661; Maher v. State, 144 Neb. 463, 13 N. W. 2d 641, 323 U. S. 757, 65 S. Ct. 91, 89 L. Ed. 606; Moore v. State, 148 Neb. 747, 29 N. W. 2d 366; Hameyer v. State, 148 Neb. 798, 29 N. W. 2d 458.

In the light of the assignments, we have searched the record. Defendant, 14 years old at the time of the alleged offense, had attended a military school for one year. He had returned to his home in Hastings on May 21, 1950. William E. Hewitt, then 13 years old, hereinafter called William, was a friend of defendant. They had corresponded perhaps a dozen times during the year while defendant was away at school. During the week between May 21 and Saturday, May 27, 1950, the day of the alleged offense, they had been together about two hours of each day. Their families lived 3 or 4 blocks from each other. They were friendly and neighborly. The night before the alleged offense they all had dinner together at the Hewitt home.

On Saturday morning defendant returned to the Hewitt home where he and William helped clean up the house. They wanted to go hunting or target shooting, which they both liked to do. They were permitted to go on Saturday morning if an adult went with them, but they found none willing to do so.

Defendant was attracted by guns, and owned several which he frequently handled and at times had previously loaded and neglected to unload them. Among them was a 10-gauge shotgun, only one barrel of which was functioning.

About 11:15 or 11:30 a. m., the two boys returned to the Turpit home where they were alone. There such shotgun, handled by defendant, was discharged, striking William a little to the left of the center of his chest just above the heart, causing his almost instant death. Defendant called the police. The call was received at 12:50 p. m. A police officer responded at once. When he arrived defendant was in the front yard. William was found slumped to the right on a couch located under the east windows of a 12 by 12 sewing room. His body was warm, but there appeared to be no heart beat. An ambulance arrived, and the officer called police headquarters requesting the presence of a doctor, the county

attorney, and other police officers. Upon their arrival William was found to be dead.

Competent evidence adduced by the State was that then and there, while defendant was out in the front yard, he calmly and with a clear voice first made statements to neighbors that he "just shot a kid * * * 'He dared me to shoot him and I shot him.' * * * 'That's only 20 years for manslaughter.' " After such statements had been made, he told the police officer that "they were in this room playing with this gun. He went to the toilet; was in there approximately five minutes; came out of the room. Willie Hewitt said, 'I dare you to fire the gun. Now it is unloaded.' He said, 'I aimed the gun at the windows, pulled the trigger, and I guess when I pulled the trigger it pulled the gun down and that was it.' " However, a short time later defendant said to William's mother and brother, "He dared me to shoot him so I did."

Defendant testified that while playing with guns they both handled the shotgun. He testified that William picked up and loaded the shotgun, but defendant removed the two shells, put them on the couch, and went to the rest room. When he returned, two shells were still on the couch, and William said that defendant would be afraid to shoot the gun, whereupon defendant started to handle the gun and demonstrate the manner in which they did so at military school.

Defendant admitted the shooting and death, but denied that he ever intentionally or willfully pointed the gun at William, but rather that standing 3½ feet from the west wall, he first pointed the gun toward the north, away from William, then, the better to demonstrate, swung around facing him but aimed it at the window above the couch at a 45-degree angle a good 2½ feet over William's head. However, the gun slipped from his arm; he grabbed it with his whole hand, squeezed the trigger as it fell in a downward position, and the gun was discharged. His contention was that

both the aiming and shooting were entirely accidental, and not accompanied by an intentional or willful pointing of the gun at any time. In that situation, a question presented and properly submitted to the jury by the trial court was whether defendant intentionally or accidentally pointed the gun at William.

Therefore, in rebuttal, the trial court over objections of defendant permitted four boys about the same ages as defendant to testify that defendant committed similar acts in the same home with the same gun on Wednesday evening and Thursday just preceding the Saturday offense here involved. Three of them testified in substance that on Wednesday evening, in their presence and also in the presence of William, defendant brought the same shotgun up from the basement in his home, opened the barrel, showed them that he had a cartridge in his hand, inserted it, and loaded the gun, pulled back the hammer part way, and swinging it around aimed it at all of the boys. The fourth boy testified in substance that on Thursday defendant got the same gun in the same home, carried it around, loaded it, cocked it, and pointed it at the chest of the witness.

When such evidence was received, the trial court orally told the jury that it was received for one purpose only, and that it was to be considered by them along with other evidence in the case solely for the purpose of determining whether or not defendant intentionally or accidentally pointed the gun at William before it was fired. In instruction No. 10 given to the jury in writing, the trial court carefully and properly so limited the sole purpose of such evidence by use of the following language: "This evidence has been received and should be considered by you solely on the question as to whether or not the defendant intentionally or accidentally pointed the gun at Hewitt before the said gun was fired. If you find from the evidence beyond a reasonable doubt that the defendant did intentionally point a loaded shotgun at other persons before the shooting of Hewitt, then

you may consider said pointing of said gun at others, together with all the other evidence in this case, upon the question as to whether the defendant intentionally pointed said gun at Hewitt before it was discharged, or whether the pointing of said gun was an accident." No complaint is made of that instruction.

Defendant argued that the admission of such evidence was prejudicially erroneous. Concededly, as stated in 22 C. J. S., Criminal Law, § 682, p. 1084, citing many authorities, including cases from this jurisdiction: "The general rule is that evidence that accused has committed another crime independent of, and unconnected with, the one on trial is inadmissible; it is not competent to prove one crime by proving another."

However, there are exceptions to such rule, as well established as the rule itself, and which have in fact been recognized by some authorities as a part of the rule.

As stated in 22 C. J. S., Criminal Law, § 683, p. 1095, citing numerous cases sustaining it: "Another common exception is that evidence of other offenses, particularly similar ones, is admissible where it tends to establish the absence, or to rebut an inference or claim, of mistake, accident, or inadvertence; * * *."

As stated in I Wharton's Criminal Evidence (11th ed.), § 350, p. 520: "Testimony of other similar offenses has been admitted to show intent where there is or may be, from the evidence, an inference of mistake, accident, want of guilty knowledge, lawful purpose, or innocent intent. Where an act is equivocal in its nature, and may be criminal or honest according to the intent with which it is done, then other acts of the defendant, and his conduct on other occasions, may be shown in order to disclose the mastering purpose of the alleged criminal act." Also, again in § 354, p. 536, citing numerous cases, it is said: "Evidence which shows, or tends to show, the commission of another crime is admissible when it shows

the absence of accident or mistake in the commission of the act charged against the accused."

In Underhill's Criminal Evidence (4th ed.), § 183, p. 327, citing numerous authorities, including cases from this jurisdiction, it is said: "Another exception to the rule occurs when the intention present in an act is material. Thus, suppose the question is, was a given act, either by the accused, or by some other person, intentional or accidental? Here it is relevant to prove that the person whose intention is in question had performed acts of a precisely similar nature either before or after the act the intention of which is in question. And if it be found that he has performed many such acts, we have the best of grounds for drawing the conclusion that the act, in the present instance, is intentional and not accidental." See, also, 20 Am. Jur., Evidence, § 313, p. 293; II Wigmore on Evidence (3d ed.), § 300, p. 192, § 302, p. 196, § 307, p. 207, § 363, p. 274.

As stated in Jones on Evidence, Pocket Edition, § 144, p. 164, citing cases: "Applying the same principle the courts have often received evidence of other similar offenses in the trial of indictments for homicide or homicidal assaults, as tending to show a deliberate plan or to repel the inference of accident." Again, in § 145, p. 165, it is said: "Such evidence is only allowed to show the knowledge or intent of the party or to repel the inference of accident, and then only when the proof shows such a connection between the different transactions as raises a fair inference of a common motive in each." See, also, Knights v. State, 58 Neb. 225, 78 N. W. 508, 76 Am. S. R. 78; People v. Seaman, 107 Mich. 348, 65 N. W. 203, 61 Am. S. R. 326; and People v. Molineux, 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 193, leading cases; and State v. McDonald, 14 R. I. 270, a case very similar to that at bar.

"It is a rule of criminal law that evidence to rebut or disprove statements as to material facts, made on direct examination by the defendant, may be offered

and received in evidence." Anderson v. State, 150 Neb. 116, 33 N. W. 2d 362. In the light of the foregoing, we conclude that the evidence was properly admissible to rebut the defense of accident made by defendant.

Over objection of defendant, a photograph of deceased was received in evidence. It identified him and clearly indicated the nature, size, extent, and location of the wound, thus explaining, attesting, and verifying the related detailed testimony of the physician who first examined deceased after the alleged offense, and testified that the photograph was a fair representation of what he observed at that time. The undertaker also affirmed the accuracy of the photograph. Under the peculiar circumstances it also served as evidence to demonstrate, in the light of scientific tests made with the gun involved, at distances of 3, 6, and 9 feet, that the gun was less than 3 feet from deceased when fired and that the shooting did not occur in the manner and from the point claimed by defendant.

In Vaca v. State, 150 Neb. 516, 34 N. W. 2d 873, this court held: "A photograph proved to be a true representation of the person, place, or thing which it purports to represent, is competent evidence of anything of which it is competent and relevant for a witness to give a verbal description.

"Where a photograph illustrates or makes clear some controverted issue in the case, a proper foundation having otherwise been laid for its reception in evidence, it may properly be received, even though it may present a gruesome spectacle.

"Photographs of the person or body of a deceased, proper foundation having been laid, may ordinarily be received in evidence for purposes of identification, or to show the condition of the body, or to indicate the nature or extent of wounds or injuries thereon."

In that connection, Lee v. State, 147 Neb. 333, 23 N. W. 2d 316, and Knihal v. State, 150 Neb. 771, 36 N. W. 2d 109, 9 A. L. R. 2d 891, relied upon by defendant, are

clearly distinguishable upon the facts and applicable law.

The objection made by defendant to admission of the photograph was that it was "incompetent, irrelevant and immaterial; not in support of any issue; highly prejudicial." No objection was made on the ground that there was not sufficient foundation for its introduction.

In Neal v. State, 104 Neb. 56, 175 N. W. 669, this court held: "An objection that certain evidence offered is 'incompetent, irrelevant and immaterial' is not necessarily sufficient to require its exclusion on the ground that there is not sufficient foundation for its introduction." In any event, the photograph was properly identified, verified, and authenticated as correctly reflecting the condition in which the physician and undertaker found the body of deceased after the alleged offense. See Annotation, 9 A. L. R. 2d 899. Under the circumstances presented, we conclude that it was not an abuse of discretion to admit the photograph in evidence.

We turn then to defendant's contention that instruction No. 7 was erroneous. In that connection, it will be noted that an instruction identical in all material respects with that about which defendant here complains was given by the trial court under circumstances comparable with those at bar, and thereafter approved by this court in Egbert v. State, 113 Neb. 790, 205 N. W. 252. We therefore conclude that the contention has no merit.

In the light of the evidence appearing in this record, a jury might well conclude, as it must have done, that defendant intentionally pointed a loaded shotgun at deceased, which was an unlawful assault, and that under such circumstances the gun was unintentionally discharged, killing William, which was manslaughter. Ford v. State, 71 Neb. 246, 98 N. W. 807, 115 Am. S. R. 591; Thiede v. State, 106 Neb. 48, 182 N. W. 570, 15 A. L. R. 237; Egbert v. State, *supra;* Annotation, 5 A. L. R. 610.

For the reasons heretofore stated, ·we conclude that there was no prejudicial error in the record, and that judgment of the trial court should be and hereby is affirmed.

AFFIRMED.