RICHARD BROCKMAN, PLAINTIFF IN ERROR, V. STATE OF NEBRASKA, DEFENDANT IN ERROR.

79 N. W. 2d 9

Filed November 2, 1956. No. 33961.

*Alfred A. Fiedler,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Homer G. Hamilton,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

Plaintiff in error, Richard Brockman, hereafter called the defendant, was charged by indictment with rape. He was 19 years old at the time of the alleged offense. The prosecutrix was 19 years old at that time. The defendant pleaded not guilty. Upon trial to a jury he was found guilty, and upon the overruling of his motion for new trial he was sentenced to serve 12 years in the penitentiary. He thereupon prosecuted error to this court.

The defendant assigns as error that the verdict is not sustained by the evidence and is contrary to law, and that the trial court should have sustained the defendant's motion for directed verdict at the close of the State's

evidence and at the close of all of the evidence.

The record discloses that Rosemary Menges, at the time of trial Rosemary Menges Gray, who formerly lived in Council Bluffs, Iowa, knew and was a friend and schoolmate of Laura Kobold, now Laura Lemire, and Louann Carlson. Joan Bennett, whom the prosecutrix had known for a short time, on the evening of July 30, 1954, went to Council Bluffs and contacted the girls previously mentioned. They drove to Omaha, Nebraska, to a house on Thirty-sixth Street between Dodge and Farnam Streets, for the purpose of meeting some girls who lived there. When they arrived the girls were not at home so they sat on the porch to wait for them. Shortly thereafter a Ford convertible drove up containing four boys, one of whom was the defendant. The boys saw the girls and stopped the car. The boys got out of the car, introduced themselves at least by their first names, and talked to the girls. Some conversation developed as to whether the girls would like to go to Campbell's minature golf course, not too far distant, and play golf. The girls who lived in the house returned in a few minutes. The prosecutrix and Laura Kobold went into the house to visit with them. Upon their return it was agreed by the girls that they would accompany the boys. The prosecutrix sat in the front seat with the defendant to her right, Laura Kobold to her left, and to the left of Laura was Bob Morse the driver. The other two girls and boys got into the back seat of the car. They drove to Fortieth and Hamilton Streets and parked near a bar where the boys finally obtained some whisky. They brought it back to the car, mixed it with Seven-Up, and offered it to the girls who refused to take it. The girls told the boys that it was getting late, to forget the golf, that they wanted to go home. The boys agreed to take them back to the house. They proceeded to the corner of Thirtieth Street where a convertible containing some boys was parked in a filling station. These boys yelled, and

Brockman and one of the other boys jumped out of the car. Brockman had a knife that he had taken from the glove compartment of the car, and the other boy had a pop bottle. They pursued the other car as it pulled out of the filling station but were unable to catch it and returned to their car. The girls pleaded to be taken home. The boys said they would take them home, but they continued to drive around in a circuitous route which they claimed to be a short cut, and in so doing met another car containing friends of the boys. They had a short conversation and then proceeded to an isolated, wooded section in Hummel Park. The boys got out of the car and proceeded to the back thereof and held a conversation.

Laura Lemire testified that she was sitting next to the prosecutrix and observed Brockman attempting to pull the prosecutrix out of the car. The prosecutrix reached for the door or something to get hold of to keep herself in the car, but she was pulled out and away from the car. She was struck in the face and knocked down. When she stumbled, she was pulled up again by the defendant and then knocked down again. None of the other girls could get away to help her. The prosecutrix was screaming and calling for help, and sounded as if she were afraid. Laura could not see the prosecutrix after that but could hear her screaming and calling for help.

Louann Carlson testified that the defendant grabbed the prosecutrix by her arm and was pulling her while she was hanging on to Laura; that he pulled her out of the car and dragged her away; that the prosecutrix was fighting and screaming and saying "Help me"; and that she was unable to see the prosecutrix but that prosecutrix called Louann's name two or three times.

Joan Bennett testified that the defendant pulled the prosecutrix from the car; that the prosecutrix endeavored to restrain him from doing so and pulled back; that the prosecutrix seemed to fall when she was pulled

from the car and Brockman continued to pull her away from the car; and that she was away from the car herself later on. She could hear the prosecutrix screaming and pleading for help. She could hear a sound as if someone was hitting someone else.

The prosecutrix testified that the defendant opened the door, grabbed hold of her arm, and said something about getting out of the car. The prosecutrix said no, that they wanted to go back home, and asked that he let go of her. He kept pulling. She had one hand on the car door and her feet braced against the car. The defendant grabbed hold of her by her other hand and pulled her out of the car. She then called for Louann to help her. Laura grabbed hold of her waist but the driver of the car loosened Laura's grip and the defendant pulled the prosecutrix out of the car and she lost her balance. The defendant kept pulling her away from the car. Her heel had come out of her shoe and she was endeavoring to put it back and asked the defendant to please let her put her shoe on. He kept pulling, and the shoe came off. She asked the defendant to help her find her shoe. He had a tight grip on both of her arms. She tried to pull back away from him, but he kept pulling her away from the car. When they were 10 or 15 feet away from the car he grabbed hold of her blouse and it came open, and her bra strap broke. He had let go of one of her hands and she tried to jerk away. The defendant grabbed hold of her loose hand again and started to pull her. She was calling for Louann to come and help her. The defendant slapped her with the palm of his hand. She tried to pull away and he slapped her again. She continued to cry out. He pulled her back into a place where there were bushes and trees all around. She continued to call for Louann, and the defendant struck her with his fist on the cheek and kept pulling her back. She kept calling for Louann and pulling herself away. The defendant struck her again and knocked her down. She brought her

knees up against her chest and he was leaning against her legs while she was lying on the ground on her back. While his chest was up against her knees "he kept saying that he was going to get it and he wanted to know if I was going to give it to him the easy way or the hard way." She further testified that she kept pleading with him to let her up; that she called to Louann to come and help her; and that this made the defendant mad. She had one hand free and spread it across his mouth with the fingers separated. The defendant said "Damn you," pressed his hand around her throat, and hit her on both sides of the face with his fist while holding her around the neck. He grabbed hold of her shorts, jerked and ripped them, and her pants came off with the shorts. She covered her person with her hands. This made him mad and he hit her in the face again with his fist. He then started to get up against her and held her with one hand around the top of her body. She tried to raise her hands to defend herself and he kept pushing against her and she was unable to raise a hand or to defend herself.

When the prosecutrix returned to the car her clothes were torn and dirty and her face was swollen. The girls were taken back to the place where their car was parked. The boys drove into an alleyway and parked and let them out, and someone said: "If you go to the police with this we will find you and kill you." One of the boys got out of the car and stood in front of the license plate.

The prosecutrix was taken immediately to her home in Council Bluffs by Joan Bennett. When she arrived there she found she had lost her key. She rang the doorbell and her mother let her in.

The mother of the prosecutrix testified that the prosecutrix fell against her and the mother asked what was wrong, if she had been attacked. The prosecutrix could not talk. Her hair was stringing and dirty, her face and eyes were swollen and black and blue, her jaw

was swollen, and her lips were black and blue.

A nurse who roomed in the home of the prosecutrix saw her when she arrived at home and testified that her face was practically unrecognizable, it was so swollen, and discolored a deep red and sort of blue. There were red marks around her throat. Her blouse was hanging open, her shorts were ripped, and one shoe was gone. She seemed to be groggy.

The prosecutrix was taken to a hospital where she was examined by a senior medical student and later by a physician. The examination disclosed that her face was badly swollen, she had numerous bruises and contusions about the face, and her eyelids were swollen. She had severe bruises on her face, particularly on the left side. Her neck was bruised and swollen. Scratches were apparent on her neck, chest, and abdomen. The hymen was lacerated and bleeding, and the posterior floor of the vaginal vault was badly contused and bruised. There were lacerations on the floor of the vagina caused by the use of force. It was the doctor's opinion that this was the first act of intercourse she had had. There was male semen present in her vagina.

The defendant testified that he and the boys he was with had never met the girls before, and that the girls agreed to go riding with them. He further testified that he made love to the prosecutrix during the course of the ride and when they arrived at the section in Hummel Park where the car stopped he opened the car door and asked her to take a walk. She said it was dark, and he said he would help her. She got out of the car voluntarily. She fell, and he helped her up. They walked up a hill, with his arm around her shoulders, and she had her arm around his waist. He started kissing and making love to her and asked her to have intercourse. She agreed, after telling him she was not a virgin. She tempted him, and it was a complete act of intercourse which she did not resist and willingly consented to. As they were finishing the act of intercourse she started

to cry and whimper, grew hysterical, and "passed out." He did not know what to do, so he slapped her on both sides of the face four times to bring her out of it, because he was afraid when she did not respond to his calling her name.

The defendant argues that the fact that the evidence shows he had intercourse with the prosecutrix is not sufficient to show that he exercised force or that she resisted to the extent the law requires.

The rule as stated in Cascio v. State, 147 Neb. 1075, 25 N. W. 2d 897, is as follows: "The degree of force required is relative, depending upon the particular circumstances, but in any such case it must be sufficient to subject and put the dissenting woman within the power of the man, and thus enable him to have carnal knowledge of her, notwithstanding good-faith resistance on her part. In that connection, whether carnal knowledge was forcible and against her will or with her consent, is ordinarily indicated by resistance or lack of it by the woman. While the degree of resistance required is also relative, depending upon the particular circumstances, the general rule is that a mentally competent woman must in good faith resist to the utmost with the most vehement exercise of every physical means or faculty naturally within her power to prevent carnal knowledge, and she must persist in such resistance as long as she has the power to do so until the offense is consummated."

Under all the circumstances shown by this record, the jury could properly find that the prosecutrix resisted the defendant in good faith and to the utmost of her ability. The evidence shows that the prosecutrix was a virgin, 19 years of age, weighing 110 pounds. The defendant was a young man 19 years of age, 6 feet tall, weighing 195 pounds. The evidence shows that the prosecutrix was forced out of the car. She was beaten before the act of intercourse took place. Her clothing was torn, and her appearance could leave no doubt that

unusual force was used in the commission of the act. The physical facts refute the story told by the defendant that he simply slapped her when he was afraid because she did not answer. The evidence of the examining physician was that the damage to her sexual organs was the result of violent force. She resisted until she could not even raise a hand.

"Whether or not the prosecutrix resisted advances of the defendant to the extent of her ability under the circumstances presented by the evidence is a question of fact, and where her testimony, if believed, would indicate that she had so resisted, a verdict based on such testimony will not be set aside." Medley v. State, 156 Neb. 25, 54 N. W. 2d 233.

The lurid details of the crime, as shown by the evidence, beyond question demonstrate that if the State's evidence is believed, every element of the crime of rape was established. The evidence clearly sustains the finding of the jury that the defendant raped the prosecutrix at the place and time charged.

The defendant assigned as error the ruling of the trial court that defendant's expert witness was not permitted to testify as to the foundation for the admission of exhibit 14, a colored transparency of the prosecutrix, in evidence.

Lieutenant Elliott of the Omaha Police Department took the colored transparency of the prosecutrix at her home in Council Bluffs on August 3, 1954, 3 days after the alleged rape. He used standard equipment. He described the manner in which the prosecutrix was dressed, her physical condition, and facial features at the time he took the picture, to the effect that her face was swollen beneath the eyes and the lower eyelids were dark red. Her eyes were bloodshot, and her face and lips badly swollen. The exhibit was authenticated by his statement that it truly and accurately reproduced and reflected the general appearance and the appearance

he had described of the prosecutrix on the date that he took the picture.

The defendant's counsel requested that the jury be excused as he desired to offer the testimony of an expert witness on the foundation going to the admissibility in evidence of the colored transparency, exhibit 14, on the ground that the State's witness testified to the effect that he did not believe you could get an exact reproduction of the object photographed, and that he wished to argue a point of law on this proposition. The trial court refused to permit the witness to testify.

In the annotation, 9 A. L. R. 2d 904, it is said: "In view of the practical impossibility of obtaining photographs which perfectly represent their subject, it would seem that when the courts state that one offering photographs in evidence should prove that they are accurate and correct, they really mean that it must be shown merely that the photographs are sufficiently correct to be helpful to the court and jury. * * * And in Blake v. Harding (1919) 54 Utah 158, 180 P 172, the court said: 'As a matter of course, before a photograph is admissible under the circumstances disclosed in this case, it must be made to appear that it is a true or correct picture or representation of the objects photographed and in question. By that is not meant that it must be shown that the photograph is a true and correct picture or representation of the object photographed in the minutest details, but it must be made to appear that the photograph is a substantially true and correct picture or representation of the objects, and not a distorted or false one.' * * * The fact that there is conflicting evidence as to the accuracy of photographs does not require their exclusion. If the witnesses for the party offering the photographs testify that they are substantially correct they may be admitted, and their correctness then becomes a question for the jury."

In Beads v. State, 160 Neb. 538, 71 N. W. 2d 86, wherein a colored transparency was offered in evidence,

this court held: "A photograph proved to be a true representation of the person, place, or thing which it purports to represent is proper evidence of anything of which it is competent and relevant for a witness to give a verbal description." See, also, Vanderheiden v. State, 156 Neb. 735, 57 N. W. 2d 761; Turpit v. State, 154 Neb. 385, 48 N. W. 2d 83.

The defendant cites Kitts v. State, 151 Neb. 679, 39 N. W. 2d 283, where the court had before it the question of the foundation as to the admissibility of a confession, and it was said that: "When the State in the case at bar offered testimony relating to defendant's alleged confession, his counsel opportunely and appropriately objected to its admission for the reason that no sufficient foundation had been laid, and requested that all the evidence relating to foundation therefor, and the nature and character of the statements allegedly made by the defendant, should be first adduced out of the presence of the jury, as approved in Schlegel v. State, 143 Neb. 497, 10 N. W. 2d 264, and cases cited therein."

The defendant contends that the identical situation exists in this case with reference to exhibit 14. In the case of Kitts v. State, *supra*, it was held that the question of proper foundation for admission of a confession was a question of law to be decided by the court, but, if the confession was admitted it was error not to submit to the jury for its determination the factual question of whether it was obtained voluntarily or by force, threats, or fear. In the instant case the foundation for exhibit 14 had already been made by the police officer who took the picture. What defendant wanted to do was to refute the testimony which exhibit 14 injected into the case, and to prove that it did not actually reproduce and represent the prosecutrix at the time it was taken. That type of evidence should have been introduced by the defendant as part of his case. We believe the trial court ruled properly that if defendant wanted to attack the authenticity of this photograph

he should do it as part of his defense. It is obvious that Kitts v. State, *supra,* on the point contended for by the defendant, has no applicability to the case at bar. The above assignment of error is without merit.

The defendant contends the trial court erred in coercing a verdict of the jury by oral instruction.

What the trial court did was to make a statement which in no sense constituted an instruction. This statement was to inquire whether or not the jurors desired to continue their deliberation or, due to the lack of facilities to accommodate the jury overnight, to go to a hotel for the night and further deliberate the next day. The jurors indicated they would rather retire to the jury room and continue their deliberation. We have examined this oral statement and conclude that by it the court did not attempt to tell the jurors anything except to explain that there were no facilities available for them to stay overnight in the courthouse and that they could go to a hotel if they desired. The court was not asking for information, and gave no directions nor any urging to do or not to do any particular thing. Insofar as proceedings in the instant case are concerned, there is no indication that the statement made by the trial court could amount to coercion or any attempt to influence the verdict of the jury. See, Williams v. State, 69 Neb. 402, 95 N. W. 1014; Gebhardt v. State, 80 Neb. 363, 114 N. W. 290; Griess v. State, 121 Neb. 467, 237 N. W. 405; Annotation, 85 A. L. R. 1425. This assignment of error is without merit.

Upon the entire record, there is no error prejudicial to the accused, and the judgment of the district court is affirmed.

AFFIRMED.