ROBERT W. JURGENSON, PLAINTIFF IN ERROR, V. STATE OF NEBRASKA, DEFENDANT IN ERROR.

88 N. W. 2d 129

Filed February 21, 1958. No. 34289.

*James E. Abboud, Jr.*, and *Hugh J. Boyle*, for plaintiff in error.

*Clarence S. Beck*, Attorney General, and *Homer L. Kyle*, for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

On April 17, 1957, Robert W. Jurgenson, plaintiff in error, hereinafter referred to as defendant, by information was charged with the crime of manslaughter in the district court for Douglas County. On April 18, 1957, the defendant was brought into court in the custody of the sheriff, and without counsel. It appearing that the defendant was in indigent circumstances and unable to employ counsel, upon motion of the county attorney the court appointed the public defender to represent the de-

fendant. The defendant waived the filing of a complaint and preliminary examination, and, upon being arraigned, pleaded guilty to the charge of manslaughter. Sentence was deferred pending further investigation by the adult probation officer.

On April 30, 1957, the defendant was brought into court in custody of the sheriff, and counsel employed by defendant being present, the defendant was arraigned for sentence. Testimony was taken on the defendant's motion to withdraw his plea of guilty entered on April 18, 1957, and to enter a plea of not guilty. This motion was overruled by the court and the defendant was sentenced to imprisonment in the Nebraska State Penitentiary for a period of 10 years.

On May 6, 1957, the defendant filed a motion for new trial, and on May 20, 1957, defendant filed an amended motion for new trial. The motion for new trial was overruled. On May 28, 1957, the defendant gave notice of his intention to apply for a writ of error and requested the sentence imposed upon him be suspended and he be released on bond. This application was denied. The defendant brings error proceedings to this court.

The defendant made a statement at the central police station in Omaha to John J. Hanley, chief deputy county attorney of Douglas County, and Alvin Clinchard of the Omaha police department. The statement was taken by a court reporter at 4:10 p.m., on April 16, 1957. We set forth in substance the pertinent facts contained in this statement.

The defendant stated that he had been questioned previously concerning an incident that took place in his home on Sunday morning, and that he had requested the right to talk to the chief deputy county attorney of Douglas County at the time of this hearing; that it was his intention to give a second statement concerning the events that took place in his home on Sunday morning about 2 a.m., April 14, 1957; that he voluntarily made this statement, and had previously been advised that

he did not have to make it and could stand upon his constitutional rights; that he understood his constitutional rights; that understanding such rights, he wished to give a statement; and that there had been no promises, threats, or abuse of any kind toward him, or anything like that to procure the statement. He further stated that on Saturday evening, April 13, 1957, he and his wife, Phyllis Jurgenson, with a woman referred to as Pat Dockweiler, went for a drive in his car. The three of them went to the Lee Bar and each had a drink of seltzer high and whiskey. They stayed in the Lee Bar about 30 minutes. The three of them left the Lee Bar and went to the Silver Tap. Arriving at the Silver Tap, they sat down in a booth and ordered a round of drinks. A man sitting at the bar came over to talk to the defendant. The defendant's wife and Pat Dockweiler were dancing together at the time. The man asked to join them. They all had a couple of rounds of drinks and left the Silver Tap about 10:30 p.m. They then went to the Gay Time Bar at Twenty-fourth and Leavenworth Streets, arriving there about a quarter to 11 or 11 o'clock. They occupied a booth and had a round of drinks. There were two men there whom Pat Dockweiler knew. These men joined the party, and they had another round of drinks. The man who joined them at the Silver Tap left. When the five of them were sitting at a large table, the defendant's wife danced with one of these men three or four times. The defendant's wife then went to a ladies rest room and the defendant followed her. The defendant asked her what she was doing and she said: "I am writing down my name and phone number for Pat, * * * This guy wants Pat's name and phone number, * * * I am going to give him mine," or something like that, and said it was so that he could get hold of her. Then the defendant and his wife went back and sat down, the defendant asked her what she was doing with that paper, and she said she was going to give it to Pat. The defendant then suggested that

they go home. This was between 12 and 12:30. They went home, the defendant's wife doing the driving. Upon arriving at their home, they sat in the car 15 or 20 minutes and discussed the matter of the defendant's wife giving her phone number. They kissed and made up while in the car. They then went upstairs. After going upstairs, the defendant sat in the kitchen for a while and his wife went to the bathroom to get ready to go to bed. He asked her if she wanted him to fry a couple of steaks or get something to eat, and she said she did not want anything. After about 15 minutes, the defendant went to the bedroom and found his wife sitting on the edge of the bed in her night clothes. He sat down beside her and they again talked about the matter of the phone number. He told her she was lying about getting the address for Pat, and she said she was not lying. She then admitted that she was getting it for herself. He asked her: "How come you are getting it for yourself?" She said: "I don't know, I was drinking." She had been drinking, but was not drunk. Then the defendant went to the dresser and got a gun and twirled it around a couple of times. His purpose was to scare his wife. He was mad. The gun had one shell in it. He twirled it around and it went "bang." After he had fired, he saw her head going over and he dropped the gun, or laid it down, and went to the telephone and dialed for help. The bullet had entered his wife's forehead and killed her. He was angry at her when he fired the shot.

The record shows that when the defendant entered his plea of guilty to the charge of manslaughter on April 18, 1957, he was accompanied by the public defender of Douglas County appointed by the court to defend him. The public defender stated to the court that he was present in court on April 18, 1957, when the defendant entered his plea of guilty of manslaughter; that he had talked to the defendant previous to that time and advised the defendant absolutely as to his constitutional

rights; that he talked to the defendant on three occasions; that the defendant told him his story; that it was the defendant's desire to plead guilty, and the public defender advised him that he was entitled to a trial if he wanted it, that a man charged with the commission of a crime was deemed innocent until he was found guilty, and advised the defendant what his rights were again and asked him if he desired to plead guilty; and that the defendant intimated what he wanted to do.

A Mr. Hayes, an attorney in the office of the public defender, told the court he was present at the last conference had between the defendant and the public defender, and the defendant was fully advised as to his constitutional rights.

The public defender withdrew from the case and the defendant's employed attorney took over the proceedings thereafter.

On April 30, 1957, before sentence was pronounced, the defendant testified that he was and had been a pipe fitter since 1950; that he was married and the father of three children ages 10, 8, and 7; that he went through the fifth grade in school; that he was brought to jail by two detectives who questioned him; and that other people questioned him until about 6 o'clock in the morning. This would be Monday morning, April 15, 1957. The defendant further testified that he was questioned again later; and that about 4 days later he was brought to the county courthouse where he talked to the chief deputy county attorney, Mr. Hanley, who told the defendant that it was no accident, and that he was going to throw a first degree murder charge at him, that is, a first or second degree murder charge. This witness could not remember exactly, he was mixed up and everybody was talking. He further testified that Hanley said if he would tell his story the way Hanley wanted him to, then he would be charged with manslaughter; that he made the statement heretofore set out in substance; and that he talked to the public defender and was told

by him of his rights and that he did not have to plead guilty. He was asked why he had pleaded guilty and his answer was: "I don't know; I was scared, I guess." He was asked: "Q- Scared of what? A- Going to charge me with first degree murder. Q- You were scared of their intimidations? A- Yes. Q- And that is the only reason you pleaded guilty? A- Yes."

On cross-examination the defendant testified that he talked to Captain Clinchard of the Omaha police department the next day after the incident happened, and talked to him on several occasions; and that Captain Clinchard never threatened or abused him in any way, had been pretty close to the investigation, and had conducted it. Hanley asked the defendant: "And you gave me a statement of exactly how it happened, after you had thought it over, that night; and you gave another statement to me, didn't you? A- The day I was in your office you told me you were going to throw a first or second degree murder charge at me." The defendant did recall that at his request Hanley discussed with him the degrees of murder, first, second, and manslaughter, and told him those would be the charges involved in this case. He further testified that the first and second degree murder charges that he might be faced with scared him, and that Hanley did scare him in this respect.

On re-direct examination the defendant testified: "Q- They never abused you physically, did they? A- No. Q- Then you would say that the only reason that you agreed to plead to manslaughter was that they threatened you with first degree murder if you did not? A- Yes, sir."

Hanley, the chief deputy county attorney, testified: "We did discuss at his (defendant's) request the degrees of homicide, and I told him there was a first degree, second degree, and manslaughter; and that depended upon what evidence there was in the particular case, which would determine what charge was to be filed."

Captain Clinchard testified that at the conference, and later when the reported statement was taken at the Omaha police station, the chief deputy county attorney, Hanley, did not at any time in that conference threaten the defendant with a first or second degree murder charge if he did not make a plea of guilty to manslaughter; that this witness was convinced the defendant fully understood the charge of manslaughter, and that he wished to make a direct plea; and that he had explained to the defendant the degrees of murder prior to the time of taking the written statement heretofore mentioned.

The court overruled the defendant's motion to withdraw his plea of guilty and denied the defendant's motion to enter a plea of not guilty. The defendant was then sentenced as heretofore set forth.

The defendant sets forth several assignments of error which are interrelated and which present to this court the question: Did the court err in refusing the request of the defendant to withdraw his plea of guilty and enter a plea of not guilty?

Before taking up this question, the defendant contends that from an examination of the information, the court did not legally record on the information the plea of guilty of the defendant. Attention is directed to section 29-1820, R. R. S. 1943, which provides as follows: "If the accused pleads 'guilty,' the plea shall be recorded on the indictment, and the accused shall be placed in the custody of the sheriff until sentence."

In Preuit v. People, 5 Neb. 377, it was held: "The statute directing the entry of the prisoner's plea on the back of the indictment is not mandatory, but directory merely, and the failure to so enter it is no ground for a reversal of the judgment, when the plea is contained in another part of the record."

Section 29-1604, R. R. S. 1943, provides that the law relating to indictments applies to informations in the same manner and to the same extent.

As heretofore shown, it is a matter of record that the defendant did appear before the court on April 18, 1957, and entered a plea of guilty to the charge of manslaughter. We find no prejudicial error in the court's failure to endorse on the information the defendant's plea of guilty to the charge of manslaughter.

As to whether a plea of guilty entered in a criminal case may be withdrawn and a plea of not guilty entered, it is said in 14 Am. Jur., Criminal Law, § 286, p. 960, that the matter in capital cases, as well as other criminal cases, is usually considered as resting in the discretion of the court and the exercise of such discretion as not being subject to reversal by an appellate court unless it clearly appears that there was an abuse of discretion. The action of a trial court in refusing leave to withdraw a plea of guilty is reviewable on appeal or writ of error; and if it appears that such action was arbitrary and not the exercise of a sound judicial discretion, the appellate court will not hesitate to reverse the judgment of the trial court. See, also, 2 Am. Jur., Appeal and Error, § 141, p. 935.

As in other cases of discretionary power, no general rule can be laid down as to when a defendant will be permitted to withdraw his plea. The decision in each case must depend to a great extent on the particular attendant circumstances. See 14 Am. Jur., Criminal Law, § 287, p. 961.

A motion to withdraw a plea of guilty, and to be allowed to enter a plea of not guilty, addresses itself to the discretion of the trial judge before whom the plea is entered, and, in the absence of a clear abuse of that discretion, the appellate court will not interfere. See Annotation, 66 A. L. R. 628, citing cases from the United States courts, Arkansas, California, Idaho, Illinois, Indiana, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Montana, New Mexico, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, Washington,

West Virginia, and Wisconsin. See, also, Sandlovich v. State, 104 Neb. 169, 176 N. W. 81.

Leave should ordinarily be given to withdraw a plea of guilty if it was entered by mistake or under a misconception of the nature of the charge; through a misunderstanding as to its effect; through fear, fraud, or official misrepresentation; was made involuntarily for any reason; or even where it was entered inadvisedly, if any reasonable ground is offered for going to the jury. If such a plea has been received by the court without observance of the precautions and solemnities required by law, the court should permit the plea to be withdrawn. On the other hand, if a defendant, with full knowledge of the charge against him and of his rights and the consequences of a plea of guilty, enters such a plea understandingly and without fear or persuasion, the court may, without abusing its discretion, refuse to permit him to withdraw it. See, 14 Am. Jur., Criminal Law, § 287, p. 961, and cases cited in the notes thereunder. See, also, 22 C. J. S., Criminal Law, § 421, p. 642; Annotation, 20 A. L. R. 1445, 1454; Annotation, 66 A. L. R. 628, 638; Annotation, 149 A. L. R. 1403, 1413.

The defendant and the State both cite Bordeau v. State, 125 Neb. 133, 249 N. W. 291. The defendant cites the case to show that the defendant in the cited case was a very young man of more than ordinary intelligence, education, and poise, and capable of making his own choice, while the defendant claims in the instant case that he is not of ordinary intelligence and education, but is a pipe fitter with only a fifth grade education. The State cites the case because of the similarity in some of the elements therein to the instant case. The defendant, Bordeau, through jealousy, stabbed a man by the name of Workman to death with an ice pick because of Workman's attentions to Bordeau's wife. On October 16, 1930, the defendant was questioned by the county attorney and made answers in writing, after having been fully advised as to his immunity. On the

morning of October 17, 1930, he was taken to the county court for his preliminary hearing. He was offered an opportunity to consult counsel and was informed that he would be furnished counsel if he so desired. He asked if he could act as his own attorney, and did so. He was bound over to the district court. He immediately requested the county attorney to explain to him the different degrees of homicide, which was done. He offered to plead guilty to manslaughter, if the county attorney would charge that offense. The county attorney refused on the ground that he thought the facts indicated at least second degree murder. Later that day the defendant told the county attorney he would plead guilty to murder in the second degree, if so charged. When he was so charged and was brought before the district court to be arraigned, the court very carefully and methodically explained to him his right to have counsel (either of his own or appointed by the court) and all other rights afforded him by law, including the nature of the charge and the penalties. He told the court he had not been influenced by promises or coercion or in any other manner in reaching this decision to plead guilty. Upon acceptance of such a plea, the court told defendant he could have any one he desired talk to the court and that a full investigation would be made before sentence. On November 3, 1930, Bordeau was sentenced to serve a term of 25 years in the penitentiary. After his sentence but during the same term of court he filed a motion to vacate the judgment so as to permit him to withdraw his plea and plead not guilty. This motion was overruled and the defendant prosecuted error proceedings to the Supreme Court. In affirming the decision of the trial court, this court said: "Defendant waived his right to an attorney. If he had not previously indicated a willingness to plead guilty to murder in the second degree, an information might have been filed by the county attorney charging murder in the first degree, with a possi-

bility for that extreme offense. A decision of fact, submitted to the trial court by affidavits, will not ordinarily be set aside on review unless unsupported by the evidence or clearly wrong. We are of the opinion that the findings and judgment of the district court were sustained by the evidence and were not contrary to law, that there was evidence justifying the finding of murder in the second degree, and that the district court did not abuse its discretion in refusing to set aside the plea of guilty and to permit a defense and trial by jury on the merits."

In the instant case the evidence shows that the defendant was fully advised of his constitutional rights. He had the benefit of legal counsel at the time he entered his plea of guilty to manslaughter and prior thereto by utilizing the services of the public defender. The public defender apparently more than once advised the defendant of his constitutional rights, told him every man was presumed to be innocent until he was found guilty, and that he was entitled to a trial if he wanted one. There is no evidence that the defendant was threatened in any manner by anyone connected with the case, that is, by any officer of the law or any person from the county attorney's office. There is no evidence that the defendant was abused physically by anyone seeking to obtain information from him with reference to the case. The captain of police of Omaha who investigated his case explained to him the different degrees of murder, and so did the chief deputy county attorney. The defendant voluntarily made his statement with reference to what happened. In fact, he wanted to make the statement and requested the privilege to do so. There is no evidence in the record that the defendant was induced by threats or promises to tell his story, or that any improper means was used to obtain it.

It is the defendant's contention that he pleaded guilty for fear that a more serious charge would be filed against him. He did not plead guilty until after the charge of

manslaughter had been filed. His defense against the charge of manslaughter is that the firing of the gun which killed his wife was an accident. By the defendant's version of the facts, he was mad at his wife; he knew the gun was loaded; and he got the gun in order to scare his wife. This constituted an assault within the contemplation of section 28-411, R. R. S. 1943.

In Turpit v. State, 154 Neb. 385, 48 N. W. 2d 83, this court said: "Where one intentionally points a loaded gun at another, he is guilty of an unlawful assault, and if such gun is unintentionally discharged and the person assaulted is killed thereby, he is guilty of manslaughter." See cases cited in the opinion.

The defendant's claim that he is an ignorant pipe fitter with a fifth grade education and consequently is of subnormal intelligence and incapable of understanding the crime he is alleged to have committed, and acted through fear of being charged with a greater crime, is not very persuasive. His age is not shown by the record. However, he was a married man with the responsibility of raising three children. There is nothing to show that he was not a good workman in his employment, that he was void of employment, or that he was not a responsible person. As we view his statement to the chief deputy county attorney, his response to the questions showed intelligence and continuity of thought and reason.

We conclude that the trial court, under the circumstances presented by the record in the instant case, did not abuse its sound legal discretion in denying the defendant the right to withdraw his plea of guilty and enter his plea of not guilty.

The judgment of the district court should be, and is hereby, affirmed.

AFFIRMED.

YEAGER, J., participating on briefs.